**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**
**www.flmb.uscourts.gov**

In re:                                              **Chapter 11**

**iCORECONNECT INC.**                 **Case No. 6:25-bk-3390-GER**
**iCORE MIDCO INC.**                     **Case No. 6:25-bk-3391-GER**

        **Debtors.**                            *Jointly Administered Under*
                                                    *Case No. 6-25-bk-3390-GER*

_____/

**DEBTORS' MOTION FOR ORDER AUTHORIZING THE SALE OF**
**SUBSTANTIALLY ALL OF THEIR ASSETS TO COLORTECH HOLDINGS, LLC**
**PURSUANT TO 11 U.S.C. § 363, FREE AND CLEAR OF ALL LIENS, CLAIMS AND**
**ENCUMBRANCES, SUBJECT TO HIGHER AND BETTER OFFERS**

iCoreConnect Inc. ("iCore") and iCore Midco Inc. ("Midco"), as debtors and debtors in

possession (collectively, the "Debtors"),  by and through their undersigned attorneys, respectfully

request the entry of an order by this Court authorizing the sale of substantially all of their assets to

Colortech Holdings, LLC, a North Dakota limited liability company (the "Buyer"), subject to higher

and better offers and the terms and conditions of the Purchase Agreement (as defined below), free

and clear of any and all claims (including "claims" as defined in Section 101(5) of the Bankruptcy

Code), mortgages, pledges, liens, security interests, interests, charges, encumbrances, setoffs,

recoupments, cure claims, liabilities, debts, indebtedness, costs, damages, judgments or obligations

of any character whatsoever and whenever arising, either before or after the date of the filing of these

Chapter 11 cases (collectively, the "Encumbrances"), pursuant to 11 U.S.C. § 363.[1]  In support of

this Motion, the Debtors state as follows:

---

[1]    Pursuant to the Purchase Agreement, the offer of the Buyer as set forth in the Purchase Agreement is subject to higher and
       better bids.  Thus, the relief requested in this Motion is also sought as to any such higher and better bids.

**Jurisdiction and Venue**

1.      This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334.  The subject matter of this Motion is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper in this district pursuant to 28 U.S.C. § 1408.  The statutory predicates for the relief sought in this Motion include 11 U.S.C. §§ 105, 363, 1107 and 1108 and Rules 2002, 6004, and 6006 of the Federal Rules of Bankruptcy Procedure.

**General Background**

2.      On June 2, 2025 (the "Petition Date"), the Debtors filed their Voluntary Petitions for Relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code").

3.      The Debtors operate a cloud-based software and technology company that specializes in providing HIPAA-compliant software-as-a-service solutions to healthcare providers across the United States.

4.      The Debtors' gross revenues for 2024 were approximately $10.7 million.  As of the Petition Date, the Debtors had creditors holding secured claims in excess of $4.8 million and unsecured claims in excess of $5.6 million.

5.      For more information on the Debtors' businesses and the reasons for filing these Chapter 11 cases, see the Debtors' Amended Joint Chapter 11 Case Management Summary (Doc. No. 25).

6.      Since the Petition Date, each of the Debtors has continued to operate its business and manage its properties as a debtor in possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

7.      On June 4, 2025, the Court entered its *Order Granting Debtor's Expedited Motion for Order Directing Joint Administration of Chapter 11 Cases Pursuant to Bankruptcy Rule 1015(b)* in each of the Chapter 11 cases of the Debtors (collectively, the "Joint Administration

2

Order"). Pursuant to the Joint Administration Order, the Debtors' Chapter 11 cases are being jointly administered for procedural purposes only under *In re: iCoreConnect Inc.*, Case No. 6:25-bk-3390-GER.

8. On June 25, 2025, the Office of the United States Trustee appointed an Official Committee of Unsecured Creditors (the "Committee") in these Chapter 11 cases.

9. No previous application for the relief sought in this Motion has been made by the Debtors to this Court or any other court.

### Summary of the Debtors' Prepetition Secured Indebtedness[2]

10. The Debtors' prepetition secured lenders are Element SaaS Finance (USA), LLC ("Element") and PIGI Solutions, LLC ("PIGI").

11. Midco and Element are parties to that certain Loan and Security Agreement, dated as of February 28, 2022, and Midco has executed that certain Secured Promissory Note dated February 28, 2022 in favor of Element, pursuant to which Element made certain prepetition loans to Midco in the total amount of $2 million (the "Element Loans"). The Debtors believe that Element will assert that the Element Loans are secured by a first priority lien and security interest in all of the assets of the Debtors pursuant to UCC Financing Statements filed (i) as to Midco with the State of Nevada on March 1, 2022 and (ii) as to iCore with the State of Delaware on July 10, 2024. Element claims that it is owed approximately $1.85 million as of the Petition Date.

12. iCore and PIGI are parties to that certain Subordinated Loan Agreement, dated as of December 26, 2023, and iCore has executed that certain Subordinated Note dated December 26, 2023 in favor of PIGI, in connection with a prepetition obligation in the original principal amount of $2 million stemming from investment banking fees (the "PIGI Indebtedness"). iCore and PIGI

---

2    This Motion is without prejudice to the rights of the Debtors or any other party (including the Committee) to contest the extent, validity and/or priority of any asserted liens or interests or claims of Element, PIGI or any other creditors as to the assets of the Debtors or any proceeds from the sale of the Debtors' assets.

are also parties to that certain Subordinated Security Agreement dated as of December 26, 2023 (the "PIGI Subordinated Security Agreement").  The Debtors believe that PIGI will assert that the PIGI Indebtedness is secured by a junior lien and security interest in all of the assets of the Debtors pursuant to UCC Financing Statements filed (i) as to iCore with the State of Delaware on August 19, 2024 and (ii) as to Midco with the State of Nevada on October 3, 2024.  PIGI claims that it is owed approximately $2.5 million as of the Petition Date.

13.     Pursuant to that certain Subordination Agreement dated as of December 26, 2023, by and between Element and PIGI (collectively, the "Prepetition Lenders"), PIGI agreed to subordinate all of its secured claims to the secured claims of Element.  Thus, between Element and PIGI, Element is the senior creditor.

14.     Prior to the Petition Date, PIGI attempted to conduct a sale of the Debtors' personal property pursuant to Article 9 of the Uniform Commercial Code (the "Article 9 Sale") under the Subordinated Security Agreement.  PIGI has asserted that an Article 9 sale to Valsoft for $10 million occurred prior to the Petition Date and that the Debtors no longer have any legal or equitable rights in their assets, including any right to sell their assets to a third party.  A more complete description of PIGI's position on this matter is set forth in *PIGI Solutions, LLC's Emergency Motion to Annul or Modify the Automatic Stay Prospectively* (Doc. No. 47) (the "PIGI Stay Relief Motion").

15.     The Debtors dispute all of the allegations of PIGI set forth in the PIGI Stay Relief Motion and believe that they have the legal and equitable right to sell their assets to the Buyer or any bidder with a  higher and better offer.  No closing of a sale pursuant to Article 9 of the Uniform Commercial Code occurred prior to the Petition Date.  In fact, both PIGI and Valsoft have admitted on several occasions that no such closing of a sale occurred and Valsoft is actively pursuing submitting a bid to purchase the Debtors' assets postpetition.  Accordingly, as of the Petition Date,

4

the Debtors retained all legal, equitable, and possessory right, title, and interest in their assets, subject only to any valid and properly perfected liens or security interests held by secured creditors. The Debtors' responses to the PIGI Stay Relief Motion are set forth in in *Debtors' Joint Response to PIGI Solutions, LLC's Emergency Motion to Annul or Modify the Automatic Stay Prospectively* (Doc. No. 90) (the "Debtors' Stay Relief Response"). All of the arguments in the Debtors' Stay Relief Response are incorporated in this Motion as if fully set forth herein.

### Sale and Marketing Efforts

16.     The Debtors have determined that it would be in the best interests of their creditors and their estates to maximize value through a sale of substantially all of their assets pursuant to Section 363 of the Bankruptcy Code. Absent such a sale, the Debtors will most likely be facing a liquidation under Chapter 7 of the Bankruptcy Code, which would achieve far less for creditors than a sale as a going concern.

17.     Prior to the Petition Date, based on information provided by PIGI to the Debtors, the Debtors' assets were marketed by PIGI in connection with the Article 9 Sale to 680 prospects, of which approximately 48 parties accessed the data room set up by PIGI.

18.     In addition, prior to the Petition Date, the Debtors extensively marketed the sale of their businesses to numerous parties, including those parties that would have the most interest in their software businesses, and set up a data room for prospective purchasers to conduct due diligence. Since the Petition Date, the Debtors, through their management team, have again conducted an extensive marketing campaign, having contacted over twenty-five (25) prospective purchasers and, to date, have executed approximately twelve (12) non-disclosure agreements with prospective purchasers with all of those prospective purchasers having accessed the Debtors' data room to conduct due diligence. The Debtors have also made their management team available to all prospective purchasers. Based on the foregoing, the Debtors believe that their businesses have

been thoroughly marketed in order to achieve the highest and best offer for their assets from a third-party purchaser.

**Summary of Purchase Agreement**

19.     On June 20, 2025, the Debtors entered into a letter of intent with the Buyer for the Debtors to sell, and the Buyer to purchase, substantially all of the assets of the Debtors in a sale transaction under Section 363 of the Bankruptcy Code, subject to the approval of this Court.

20.     After extensive negotiations between the Debtors and the Buyer on the terms for the sale, on July 25, 2025, the Debtors and the Buyer executed an Asset Purchase Agreement (the "Purchase Agreement"), which provides for the sale by the Debtors, and the purchase by the Buyer, of substantially all of the assets of the Debtors for a purchase price of $11,000,000.00.

21.     An executed copy of the Purchase Agreement, together with the Exhibits and Schedules thereto, is attached to this Motion as Exhibit A and is incorporated herein by this reference thereto.  Due to the photocopying and mailing costs, a copy of the Purchase Agreement (together with the Exhibits and Schedules thereto) is being transmitted only to those parties receiving CM/ECF electronic noticing in these cases.  A copy of the complete Purchase Agreement may be obtained upon written request to the undersigned counsel for the Debtors.

22.     The description of the principal business terms of the Purchase Agreement contained in this Motion is intended as a summary only and is qualified in its entirety by reference to the Purchase Agreement itself and, to the extent there is any inconsistency between the language of the Purchase Agreement and the description thereof set forth in this Motion, the Purchase Agreement shall control any such inconsistency.  Each creditor of the Debtors and any party in interest should read, consider and carefully analyze the terms and provisions of the Purchase Agreement.

23.     The principal business terms of the Purchase Agreement are as follows:[3]

1)  Subject to the terms, conditions and other provisions of the Purchase Agreement, and subject to Court Approval, at the Closing, the Sellers shall grant, sell, assign, transfer and deliver to the Buyer, and the Buyer shall purchase from the Sellers, all right, title and interest in, to and under all assets of every kind, nature and description, whether real, personal or mixed, tangible or intangible, wherever located, owned or held by the Sellers and used in or otherwise relating to the Business as set forth in Section 2.1 of the Purchase Agreement, other than the Excluded Assets (collectively, the "Purchased Assets"), free and clear of any and all Liens, other than the Permitted Liens:

    (a)     the Accounts Receivable;

    (b)     all future cash flow and cash earnings;

    (c)     all Intellectual Property, including as set forth on Schedule 6.7 attached to the Purchase Agreement;

    (d)     all items of intangible property, including the SaaS technology platform, all of its modules, and associated infrastructure that allows full working deployment of Sellers' products;

    (e)     all items of tangible personal property consisting of all furniture, fixtures, improvements, furnishings, equipment, machinery, appliances, and other personal property of every kind used in the operation of the Business;

    (f)     all inventory (including raw materials, work-in-process, finished goods and supplies);

    (g)     the Assumed Contracts;[4]

    (h)     all books and records which relate to the Business or the Purchased Assets, but expressly excluding all documents and other materials which (i) are legally privileged or constitute attorney-client work product, or (ii) are subject to any Law or a confidentiality agreement prohibiting their disclosure;

    (i)     to the extent transferable under applicable Law (including the Bankruptcy Code), permits, authorizations, approvals, decisions, zoning orders,

---

3   Unless otherwise defined in this Motion, capitalized terms used in paragraph 23 shall have the meanings ascribed to such terms in the Purchase Agreement.

4   By no later than August 8, 2025, the Debtors will file with the Court a motion authorizing the Debtors to assume and/or assign certain executory contracts and unexpired leases to the Buyer pursuant to Section 365 of the Bankruptcy Code, free and clear of all liens, claims and encumbrances (the "Contracts Assignment Motion"). The Contracts Assignment Motion will seek authority for the Debtors to assume and/or assign all of the Assumed Contracts to the Buyer pursuant to Section 365 of the Bankruptcy Code.

registrations, licenses, filings, certificates, variances or similar rights issued to the Sellers and used by or in connection with the Business;

(j)     all information regarding the Sellers' past, current and prospective customers and suppliers (including any and all lists thereof (including contact information), purchase and sale history, correspondence, complaints, and any and all other data, reports, and information of any kind kept or maintained by or on behalf of the Sellers), pricing and cost information, and business and marketing plans and proposals;

(k)     except as provided in <u>Section 2.2(a)</u> and <u>Section 2.2(i)</u> of the Purchase Agreement, all prepayments and prepaid expenses relating to the Business or the Purchased Assets;

(l)     all telephone and facsimile numbers and telephone directory listings, and all websites and domains;

(m)     rights, to the extent assignable, under any agreements in favor of the Sellers or for the benefit of the Sellers with current or former employees, contractors or third parties, with respect to non-competition, non-solicitation, or other restrictive covenants, regardless of whether any such Person accepts an offer of employment from the Buyer or continues to perform services for the Buyer;

(n)     books, records, ledgers, files, documents, correspondence, lists, plans, drawings and specifications, creative materials, sales collateral, advertising and promotional materials, studies, reports, and other printed or written materials, including records related to inventory and maintenance of the Purchased Assets, whether in written or electronic form, other than employment records that may not be transferred pursuant to applicable Law;

(o)     personnel records for Employees who are Transferred Employees;

(p)     all goodwill associated with the Business; and

(q)     all other assets that are necessary to the continued operation of the Business.

2)   Notwithstanding anything to the contrary contained in the Purchase Agreement, the Purchased Assets shall not include the following assets of the Sellers (collectively, the "<u>Excluded Assets</u>"), which shall be retained by the Sellers:

(a)     restricted and unrestricted cash and cash equivalents (including all restricted cash held by or for the benefit of the Sellers), cash accounts (including cash accounts serving as collateral for secured debt, letters of credit, insurance policies or programs), marketable securities and certificates of deposit, deposits and other prepaid amounts made or held on the account of the Sellers with respect to any Contracts (including the Assumed Contracts),

utility deposits, temporary investments of cash, and all bank accounts and all electronic fund transfer accounts;

(b)     all amounts due to the Sellers from any other Person who is an Affiliate of the Sellers, including any intercompany accounts;

(c)     all amounts due to the Sellers from any Employee for advances or loans made by the Sellers to such Employee;

(d)     any Contract that is not an Assumed Contract;

(e)     all inventory of the Sellers that is disposed of or exhausted prior to the Closing Date in the Ordinary Course;

(f)     the Sellers' corporate minute books, Governance Documents and tax records, and any other records which the Sellers are required to retain by Law (provided, however, that the Buyer shall be entitled to receive, at its expense, copies of such portions thereof as the Buyer may reasonably request which are related to the Business);

(g)     personnel records for Employees who are not Transferred Employees;

(h)     any and all of the Sellers' or the Estates' actions, claims, demands, rights, defenses, counterclaims, proceedings, suits and causes of action of any value whatsoever, whether known or unknown, in law, equity or otherwise, against any creditor or other third party and the proceeds or benefits thereof, including any and all actions which a trustee, debtor in possession or other appropriate party in interest may assert on behalf of the Debtors or the Estates under Chapter 5 of the Bankruptcy Code, including actions under one or more provisions of Sections 542, 543, 544, 545, 546, 547, 548, 549, 550, 551, and 553 of the Bankruptcy Code or under any other similar applicable federal, state or common law, and the Sellers' claims or causes of action for professional negligence and director and officer liability, but excluding (i) any claim expressly released in writing by the Sellers, and (ii) any claim against the Buyer or any Affiliate of the Buyer other than as expressly provided for in the Purchase Agreement;

(i)     any insurance policies and all insurance proceeds and return of insurance premiums arising in connection with the ownership or operation of the Purchased Assets or the Business prior to the Closing;

(j)     all claims, rights, interests and proceeds with respect to refunds of Taxes for periods ending prior to the Closing Date and all rights to pursue appeals of the same;

(k)     any personal property of any Employees of the Seller;

(l)     any Employee Benefit Plan;

(m)    the consideration delivered by the Buyer to the Sellers pursuant to the Purchase Agreement;

(n)    any and all rights of the Sellers under the Purchase Agreement and the Transaction Documents;

(o)    the proceeds, benefits and other recoveries on account of the foregoing items in subparagraphs (a) through (n); and

(p)    the assets and properties of the Sellers set forth on <u>Schedule 2.2(p)</u> attached to the Purchase Agreement.

3)    Subject to any adjustments expressly set forth in the Purchase Agreement, the purchase price to be paid by the Buyer to the Sellers for the Purchased Assets is Eleven Million and 00/100 Dollars ($11,000,000.00) (the "<u>Purchase Price</u>").

4)    By no later than August 1, 2025, the Buyer shall pay to the Escrow Agent, by wire transfer of immediately available U.S. federal funds to an account designated in writing by the Escrow Agent, an earnest money deposit in the amount of Five Hundred Thousand and 00/100 Dollars ($500,000.00) (the "<u>Total Deposit</u>"). If the Transaction shall be consummated, the Total Deposit shall be applied to the Buyer's obligation to pay the Purchase Price at the Closing as set forth in <u>Section 3.4</u> of the Purchase Agreement. If the Purchase Agreement shall be terminated and the Transaction shall not close or be abandoned, then, in all such events, the Escrow Agent shall refund or disburse the Total Deposit as set forth in <u>Section 4.1</u>, <u>Section 8.3(a)</u>, or <u>Section 10.3</u> of the Purchase Agreement, as applicable. The Party entitled to the Total Deposit shall also be entitled to the benefit of the interest accruing thereon, if any, and to the extent the Total Deposit is credited to the Purchase Price at Closing the interest accruing thereon shall also be credited to the Purchase Price at Closing

5)    By no later than one (1) day prior to the Closing Date, the Buyer shall pay to the Escrow Agent, by wire transfer of immediately available U.S. federal funds to an account designated in writing by the Escrow Agent, the remaining portion of the Purchase Price (after taking into account the Total Deposit) in the amount of Ten Million Five Hundred Thousand and 00/100 Dollars ($10,500,000.00) (the "<u>Remaining Purchase Price</u>"). At the Closing, the Buyer shall pay to the Sellers an amount equal to the Purchase Price (plus or minus any adjustments as expressly set forth in the Purchase Agreement), which payment shall be made by the transfer of the Remaining Purchase Price and the Total Deposit to the Sellers by the Escrow Agent <u>less</u> the aggregate amount of any advances under the DIP Loan Facility plus any other DIP Loan Obligations (which amount shall reduce the Purchase Price and be refunded to the Buyer).

6)    To the extent any Liability exists for any Transfer Taxes, including documentary stamp taxes, imposed in connection with the purchase and sale of the Purchased Assets and the Assumed Liabilities, the Sellers shall pay and be solely responsible for all such Transfer Taxes.

7) Personal property taxes with respect to the Purchased Assets or utility services with respect to the Business shall be prorated between the Buyer and the Sellers as of the Closing Date.

8) Subject to the terms, conditions, and other provisions of the Purchase Agreement and the Transaction Documents, at and effective as of the Closing, the Buyer shall assume the future payment and performance of (or, if otherwise stated in the Purchase Agreement, pay at the Closing) the following Liabilities (collectively, the "Assumed Liabilities"): (a) all Liabilities relating to or first arising as a result of the operation of the Business or the ownership of the Purchased Assets on and after the Closing Date, as provided in the Purchase Agreement or the Transaction Documents; (b) all Liabilities under, arising from or relating to the Assumed Contracts with respect to (i) matters occurring thereunder on or after the Closing Date, and (ii) the Cure Amounts; and (c) all Liabilities agreed to be paid by the Buyer pursuant to Section 3.6 of the Purchase Agreement. Notwithstanding anything to the contrary contained in the Purchase Agreement, except for the Assumed Liabilities and payment of the Purchase Price, the Buyer shall not assume, agree to pay, discharge or satisfy, or otherwise have any responsibility, liability or obligation for any Liability of the Sellers or any Affiliate of the Sellers.

9) The obligations of the Parties to close under the Purchase Agreement are subject to the satisfaction of the conditions precedent set forth in Article IX of the Purchase Agreement, including the entry of the Sale Order and the Contracts Assignment Order by the Bankruptcy Court.

10) Subject to Section 10.1(b) of the Purchase Agreement, the closing of the Transaction (the "Closing") shall occur no later than the fifteenth (15th) day following the day upon which all of the conditions precedent to Closing set forth in Article IX of the Purchase Agreement have been satisfied or waived (other than those conditions precedent which by their terms cannot be satisfied until the Closing but subject to the fulfillment or waiver of those conditions precedent), or such other date as the Parties may mutually determine. In the event that all of the conditions precedent to Closing set forth in Article IX of the Purchase Agreement have been satisfied or waived on or before September 30, 2025, then the Parties shall be required to close by no later than September 30, 2025. The date on which the Closing actually occurs is referred to as the "Closing Date". The Closing shall take place remotely via the exchange of signatures, documents and funds at a time and on a date mutually designated by the Parties. The Closing shall take effect as of 12:01 a.m. prevailing Orlando, Florida time on the Closing Date, it being acknowledged and agreed by the Parties that the results of operations of the Sellers and the Business up to the day prior to the Closing Date shall be for the Sellers' account, and the results of operations of the Purchased Assets will be for the Buyer's account beginning on the Closing Date.

11) The Closing deliverables to be delivered by the Debtors and the Buyer at the Closing are set forth in Section 5.2 of the Purchase Agreement.

12) The Purchase Agreement sets forth certain bidding procedures for the submission of bids from competing bidders including a break-up fee to the Buyer, which matters are described in further detail in paragraphs 25-30 below.

13) By no later than August 8, 2025, the Debtors shall file with the Bankruptcy Court the Contracts Assignment Motion. The Debtors agree to (i) assume in the Bankruptcy Case and assign to the Buyer any Contract that is designated in writing by the Buyer to the Debtors on or before August 8, 2025 (collectively, the "Assumed Contracts"), and (ii) reject in the Bankruptcy Case any Contract that is not an Assumed Contract (collectively, the "Rejected Contracts"). The Buyer shall assume all of the Assumed Contracts. The list of the Assumed Contracts and the Rejected Contracts shall together comprise all of the Contracts to which the Debtors are a party, and any Contract which is not an Assumed Contract (or subject to a pending motion to become an Assumed Contract) will be a Rejected Contract; provided, however, that in the event a Contract for insurance or indemnity in favor of the Debtors exists and the Buyer does not designate such Contract as an Assumed Contract, such Contract for insurance or indemnity benefits shall remain in force. Assumption and assignment of the Assumed Contracts shall include any ancillary or related agreements, or rights appurtenant thereto, pursuant to which the Debtors have rights or licenses granted in connection with or under the Assumed Contracts, so long as such ancillary or related agreements do not create additional obligations of the Debtors or the Buyer beyond those set out in the Assumed Contracts (unless the Buyer subsequently agrees to such obligations). The Buyer shall be responsible for and shall pay all Cure Amounts in connection with the assumption and assignment of any Assumed Contract to the Buyer. Pursuant to Section 365 of the Bankruptcy Code, and as requested by parties to the Assumed Contracts and required by the Bankruptcy Court, the Buyer shall provide adequate assurance of future performance under and with respect to the Assumed Contracts. After the Closing Date, the Debtors shall be released from any further Liability under the Assumed Contracts as provided for under Section 365(k) of the Bankruptcy Code.

14) Subject to Bankruptcy Court approval, the Buyer may, in its sole discretion, provide interim funding to the Debtors in an amount up to Three Hundred Fifty Thousand and 00/100 Dollars ($350,000.00) (the "Interim Funding") to support the operations of the Sellers pending the Closing. By no later than August 8, 2025, the Buyer shall provide a term sheet to the Debtors setting forth the terms for the Interim Funding. Upon agreement to the terms for the Interim Funding, which shall be no later than August 14, 2025, the Debtors will file a motion with the Bankruptcy Court to seek approval of the Interim Funding (the "DIP Financing Motion"). Any Interim Funding provided shall be applied as a credit to the Purchase Price at the Closing as provided in Section 3.4 of the Purchase Agreement. If the Buyer does not close the Transaction for any reason, any Interim Funding provided pursuant to a Financing Order shall be entitled to administrative expense priority status in the Bankruptcy Case and treated *pari pasu* with all other allowed administrative expense claims.

15) Prior to the Closing, the Buyer shall identify those Employees to whom the Buyer desires to offer employment. The terms of such employment shall be as the Buyer shall determine in its sole discretion. The Sellers shall use their commercially reasonable

efforts to assist the Buyer in (i) the identification of Employees the Buyer may desire to hire, (ii) facilitating meetings between the Buyer and such Employees, and (iii) transferring any rights of the Sellers under any contract with any third party employer of such Employees to the extent necessary or desirable for the Buyer to hire such Employees to the extent the Buyer elects to do so.  Prior to the Closing, the Buyer will provide the Sellers with a list of the Employees to whom the Buyer has made an offer of employment that has been accepted to be effective upon the Closing (the "Transferred Employees").  Effective as of the Closing, the Sellers agree to terminate the employment of all of the Transferred Employees. Notwithstanding the expiration of the Due Diligence Period, it shall be a condition precedent to the Buyer's obligation to consummate the Closing that the Buyer shall have entered into binding employment agreements, in form and substance acceptable to the Buyer in its sole discretion, with the Chief Financial Officer, Chief Technology Officer, Chief Operating Officer , and Vice President of Business Development of the Sellers.  If such employment agreements are not fully executed on or before the Closing Date, the Buyer shall have no obligation to proceed with the Closing, and the Total Deposit shall be promptly returned to the Buyer in full, without deduction or offset.

16) The Purchase Agreement may be terminated and the Transaction contemplated thereunder may be abandoned at any time prior to the Closing: (a) by mutual written consent of the Parties; (b) by either Party, if the Closing Date shall not have occurred (or the conditions precedent to Closing set forth in Article IX of the Purchase Agreement have not been satisfied or waived) by September 30, 2025 (the "Outside Closing Date"); provided, however, that the right to so terminate the Purchase Agreement shall not be available to any Party whose failure to fulfill any obligation under the Purchase Agreement shall be the cause of the failure of the Closing Date to occur on or before the Outside Closing Date; (c) by the Sellers, if there has been a material breach of any covenant or condition or any representation or warranty of the Buyer and the Sellers have notified the Buyer of such breach in writing, and the breach has not been cured (if capable of being cured) within ten (10) days after delivery of such notice (and if not capable of being cured, immediately); (d) by the Buyer, if there has been a material breach of any covenant or condition or any representation or warranty of the Sellers and the Buyer has notified the Sellers of such breach in writing, and the breach has not been cured (if capable of being cured) within ten (10) days after delivery of such notice (and if not capable of being cured, immediately); (e) by any Party, if there shall be any Law of any Government Entity that makes consummation of the Transaction illegal or otherwise prohibited or if any judgment, injunction, order or decree of any Government Entity prohibiting the Transaction is entered and such judgment, injunction, order or decree shall have become final and non-appealable; or (f) by the Sellers, if any party other than the Buyer is selected as the Successful Bidder for the Purchased Assets.  In the event that the Purchase Agreement shall be terminated as set forth above, all further obligations of the Parties under the Purchase Agreement shall terminate without further Liability of any Party to any other Party thereunder except as provided in Section 10.3 and Section 10.4 of the Purchase Agreement and those provisions that expressly survive the termination of the Purchase Agreement; provided, however, that no Party shall be released from Liability thereunder, subject to the express provisions of the Purchase Agreement, if the Purchase Agreement is

terminated and the Transaction abandoned by reason of (i) the failure of such Party to have performed its obligations thereunder, or (ii) any knowing misrepresentation made by such Party of any matter set forth herein.  In the event of a termination of the Purchase Agreement pursuant to <u>Section 10.1(a)</u>, <u>Section 10.1(b)</u> (due to the fault of the Sellers), <u>Section 10.1(d)</u>, <u>Section 10.1(e)</u>, or <u>Section 10.1(f)</u> of the Purchase Agreement, the Total Deposit shall be disbursed by the Escrow Agent to the Buyer.  In the event of a termination of the Purchase Agreement pursuant to <u>Section 10.1(b)</u> (due to the fault of the Buyer) or <u>Section 10.1(c)</u> of the Purchase Agreement, the Total Deposit shall be disbursed by the Escrow Agent to the Sellers.

17) All representations and warranties of the Debtors and the Buyer contained in the Purchase Agreement shall expire as of the Closing and be of no further force or effect on and after the Closing.  All covenants and agreements of the Parties shall survive the Closing for the period explicitly specified herein.  The Purchase Agreement does not contain any indemnification obligations on the part of the Debtors or the Buyer.

18) The Purchase Agreement is not subject to any due diligence investigation (which investigation period expired on July 27, 2025) or financing contingency on the part of the Buyer.  The sale and purchase of the Debtors' assets is on an "AS-IS" "WHERE-IS" basis and subject to no representations and warranties by the Debtors except as expressly provided in the Purchase Agreement.

24.    In summary, the Debtors' assets will be sold, transferred and conveyed by the Debtors to the Buyer at the Closing free and clear of all Encumbrances, pursuant to Section 363 of the Bankruptcy Code and the Sale Order and the Contracts Assignment Order.  The Encumbrances of any creditors (including the Prepetition Lenders) shall attach to the sale proceeds to the same extent, validity and priority as existed on the Debtors' assets as of the Petition Date. If no objections are filed to the secured claims of the Prepetition Lenders by the Closing, then the Debtors intend to pay the allowed secured claims of the Prepetition Lenders at the Closing.  The Debtors also presently intend to propose a plan of liquidation providing for the distribution of the sale proceeds from the Purchase Agreement to pay the allowed claims of their creditors.

## **Bidding Procedures**

25.    In the Purchase Agreement, the Debtors have (i) proposed procedures in connection with the submission of competing bids for the purchase of any or all of the Debtors' assets (the

"Bid Procedures"), and (ii) agreed to pay a break-up fee of One Hundred Ten Thousand and 00/100 Dollars ($110,000.00) (the "Break-Up Fee") to the Buyer.

26.    The Debtors request that the Court approve the Bid Procedures set forth in this Paragraph 26.  The Debtors request that the Court set a deadline of August 22, 2025 (the "Bid Deadline") for any other Person to submit a competing bid (a "Bid") for the Purchased Assets. Any and all other Bids shall be in the amount of at least Eleven Million One Hundred Thousand and 00/100 Dollars ($11,100,000.00) plus the amount of the Break-Up Fee and be accompanied by (i) a redlined version of the Purchase Agreement indicating any changes of such bidder to the Purchase Agreement, (ii) a deposit in the amount of Five Hundred Thousand and 00/100 Dollars ($500,000.00) which shall be paid to the Escrow Agent, by wire transfer of immediately available U.S. federal funds to an account designated in writing by the Escrow Agent, which deposit shall be fully refundable to such bidder if it is not the Successful Bidder, and (iii) sufficient financial information that such bidder can close on its Bid.  If any Bids meeting the foregoing requirements are received by the Bid Deadline, then the Debtors shall request, on an emergency basis, that the Court schedule an auction for the Purchased Assets (at which the Buyer may submit additional bids) and, within one (1) Business Day thereafter, conduct the Sale Hearing to determine the highest and best offer for the Purchased Assets.

27.    The Debtors believe that the Bid Procedures set forth in this Motion will assist in determining the highest and best offer available to the Debtors for the sale of their assets and the other transactions contemplated by the Purchase Agreement.  The Debtors believe that the Bid Procedures are favorable to the Debtors, their estates and creditors, and create a fair and level playing field for all interested bidders.  The Debtors submit that the Bid Procedures will satisfy the interests of all creditors in assuring that the Debtors will achieve the maximum value for their assets and the other transactions contemplated by the Purchase Agreement.

28.    In the event of a termination of the Purchase Agreement pursuant to Section 10.1(f) of the Purchase Agreement, the Debtors have agreed to pay to the Buyer a termination fee in the amount of One Hundred Ten Thousand and 00/100 Dollars ($110,000.00) (the "Break-Up Fee"). The Break-Up Fee shall only be due and payable to the Buyer in the event that (i) the Buyer is not the Successful Bidder for the Purchased Assets, and (ii) the Purchased Assets are actually sold to a party other than the Buyer (an "Alternative Transaction").  The Break-Up Fee, if earned, shall be (a) allowed as an administrative expense claim in these cases pursuant to Sections 503(b) and 507(a)(2) of the Bankruptcy Code, (b) payable to the Buyer only upon the closing of the Alternative Transaction, and (c) paid only out of the proceeds of the sale of the Purchased Assets in an Alternative Transaction.  The Debtors and the Buyer have acknowledged and agreed that the Break-Up Fee is not a penalty, but represents liquidated damages in a reasonable amount that will compensate the Buyer for the opportunity costs, time, resources, and capital committed in connection with the Purchase Agreement, which damages would be difficult to calculate with precision.  Notwithstanding anything to the contrary in the Purchase Agreement, payment of the Break-Up Fee shall constitute the Buyer's sole and exclusive remedy for termination under Section 10.1(f) of the Purchase Agreement and, upon payment of the Break-Up Fee as provided herein, the Buyer shall have no further claims against the Sellers arising from or relating to the termination of the Purchase Agreement under Section 10.1(f).  The Buyer has acknowledged and agreed that, except as provided above, the Buyer shall have no claim for any damages, monetary or otherwise, due to the termination of the Purchase Agreement.

29.    A break-up fee is a "fee paid by a seller to a prospective purchaser in the event that a contemplated transaction is not consummated." Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.), 181 F.3d 527, 528 (3d Cir.1999). Break-up fees are designed to compensate stalking horse bidders for their time, effort, and risk in participating in the bidding

process. Id. at 535.  They also encourage bidders to conduct due diligence and submit competitive bids, thereby maximizing the value of the debtor's assets.  Id.  Courts have recognized that break-up fees can be an integral part of the bidding process, as they incentivize initial bids and foster competitive auctions.  Bankruptcy courts generally require that break-up fees meet certain conditions for approval, including (a) the fee must be reasonable and proportionate to the purchase price; (b) the fee must provide a benefit to the bankruptcy estate, such as encouraging competitive bidding or maximizing asset value; (c) the fee must be negotiated in good faith and at arm's length; and (d) the fee must not chill bidding or deter other potential bidders.  See e.g., In re Sea Island Co., No. 10-21034, 2010 WL 4393269, at *1 (Bankr. S.D. Ga. Sept. 15, 2010); In re Robb & Stucky Ltd. LLLP, No. 11BK02801, 2010 WL 11814803, at *2 (Bankr. M.D. Fla. Feb. 24, 2010).

30.     In this case, the Break-Up Fee (a) is designed to compensate the Buyer for its time, effort, and risk in participating in the bidding process; (b) is reasonable and proportionate to the Purchase Price as it represents only 1% of the Purchase Price when bankruptcy courts have approved breakup fees of 3%[5]; (c) provides a significant benefit to the estates by nearly doubling the value of the assets as compared to other interested parties' initial indications of value; (d) was negotiated in good faith and at arm's length; and (e) is not disproportionate so as to chill or deter bidding.

**Relief Requested**

31.     By this Motion, the Debtors request that this Court, pursuant to Sections 363(b), (f) and (m) of the Bankruptcy Code and Rule 6004 of the Federal Rules of Bankruptcy Procedure, approve the Purchase Agreement and the sale of the Debtors' assets to the Buyer free and clear of all Encumbrances.

---

[5] In re Sea Island Co., No. 10-21034, 2010 WL 4393269, at *1 (Bankr. S.D. Ga. Sept. 15, 2010).

32.     Section 363(b)(1) states that the "trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. §363(b)(1). Courts usually defer to the business judgment of a debtor in deciding whether or not to authorize a debtor to sell property outside the ordinary course of business.  See e.g., In re Continental Airlines, Inc., 780 F.2d 1223 (5th Cir. 1986); In re Lionel Corp., 722 F.2d 1063, 1071 (2d Cir. 1983); In re Mason's Nursing Center, Inc., 73 E.R. 360, 362 (Bankr. S.D. Fla. 1987).

33.     In considering whether a debtor is justified in selling assets outside the ordinary course of business, courts consider four factors: (1) a sound business reason or emergency justifies a pre-confirmation sale; (2) adequate and reasonable notice of the sale was provided through interested parties; (3) the sale has been proposed in good faith; and (4) the purchase price is fair and reasonable.

34.     For all of the reasons set forth in this Motion, the Debtors, through the exercise of their business judgment, have determined that the sale of the Debtors' assets to the Buyer and the other transactions set forth in the Purchase Agreement are in the best interests of the Debtors, their creditors and their estates.  The Debtors have engaged in extensive efforts to market the Debtors' assets and have determined that the proposed Purchase Price offered by the Buyer including the assumption of the Assumed Liabilities by the Buyer is the highest and best offer received, is reasonable, represents fair market value, and the proposed sale is in the best interests of the Debtors' estates.  Moreover, the proposed sale to the Buyer is subject to higher and better offers which will ensure that the price is fair and reasonable.

35.     The Purchase Agreement was negotiated in good faith and at arm's length between the Buyer and the Debtors.

**Notice**

18

36.     A copy of this Motion with attached <u>Exhibit A</u> is being served on all of the parties receiving CM/ECF electronic noticing in these cases, the Buyer, the Office of the United States Trustee, counsel to the Prepetition Lenders, and all parties who have executed non-disclosure agreements with the Debtors.  A copy of this Motion without attached <u>Exhibit A</u> is being served on all other creditors of the Debtors.  Accordingly, the Debtors request that the Court enter an order finding that such notice of this Motion is adequate and sufficient and complies with the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure and the Local Rules of this Court.

37.     At the Sale Hearing, the Debtors will request that the Court enter an order waiving the 14-day stays set forth in Rules 6004(h) and 6006(d) of the Federal Rules of Bankruptcy Procedure and providing that the orders granting this Motion and the Contracts Motion be immediately enforceable and that the closing under the Purchase Agreement may occur immediately.  In addition, the Debtors will request that the Court find that the Debtors have complied (and the Contracts Motion complies) with Rules 6006(e) and (f) of the Federal Rules of Bankruptcy Procedure.  Any objection to the relief requested in this paragraph 37 must be filed with the Court by no later than the Bid Deadline.

WHEREFORE, the Debtors respectfully request entry of an order granting the relief requested herein, and such other and further relief as is just and proper.

Dated: July 28, 2025

*/s/ Charles A. Postler*
Charles A. Postler (FBN 455318)
Amy Denton Mayer (FBN 0634506)
Stichter Riedel Blain & Postler, P.A.
110 East Madison Street, Suite 200
Tampa, Florida 33602
Telephone: (813) 229-0144
Email: cpostler@srbp.com and amayer@srbp.com
Attorneys for Debtors

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing **Debtors' Motion for Order Authorizing the Sale of Substantially All of Their Assets to Colortech Holdings, LLC Pursuant to 11 U.S.C. § 363, Free and Clear of All Liens, Claims and Encumbrances, Subject to Higher and Better Offers** has been furnished on this 28th day of July, 2025, (a) with attached Exhibit A, by **CM/ECF Transmission** to all parties receiving CM/ECF electronic noticing in these cases, and (b) without attached Exhibit A, by **U.S. Mail** to all creditors of the Debtors as indicated on the Court's master mailing matrix for these cases attached hereto.

*/s/ Charles A. Postler*
Charles A. Postler

## Exhibit A

**Purchase Agreement**

(See Attached Document)

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "Agreement") is made and entered into as of July 25, 2025 (the "Execution Date"), by and among (i) **iCoreConnect Inc.**, a Delaware corporation ("iCore"), and **iCore Midco Inc.**, a Nevada corporation ("Midco" and together with iCore, collectively, the "Sellers" or the "Debtors"), on the one hand, and (ii) **Colortech Holdings, LLC**, a North Dakota limited liability company (the "Buyer"), on the other hand.  The Sellers and the Buyer are sometimes referred to below individually as a "Party" and collectively as the "Parties".  Capitalized terms used in the Recitals of this Agreement and not defined therein shall have the meaning ascribed to such terms in Section 1.1 of this Agreement.

## RECITALS

A.      The Sellers operate a cloud-based software and technology company that specializes in providing HIPAA-compliant software-as-a-service ("SaaS") solutions to healthcare providers across the United States (the "Business").

B.      On June 2, 2025 (the "Petition Date"), each of iCore and Midco filed with the United States Bankruptcy Court for the Middle District of Florida, Orlando Division (the "Bankruptcy Court"), a voluntary petition for relief under Chapter 11 of the Bankruptcy Code, which cases are being jointly administered under Case No. 6:25-bk-03390-GER (collectively, the "Bankruptcy Case").

C.      From the Petition Date through the Execution Date, each of the Debtors has operated its business and managed its properties as a debtor in possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

D.      The Sellers desires to sell to the Buyer, and the Buyer desires to purchase from the Sellers, the Purchased Assets, and the Buyer agrees to pay to the Sellers the consideration set forth in this Agreement including the assumption by the Buyer of the Assumed Liabilities, on the terms and conditions set forth in this Agreement and in accordance with Sections 105, 363, and 365 and other applicable provisions of the Bankruptcy Code and applicable Bankruptcy Rules (collectively, the "Transaction").

E.      The consummation of the Transaction is subject to Court Approval.

F.      The Purchased Assets and the Assumed Liabilities include assets and liabilities of the Debtors which are to be purchased and assumed by the Buyer pursuant to (i) an order of the Bankruptcy Court granting the Sale Motion and approving the Transaction and the sale of the Purchased Assets to the Buyer (the "Sale Order") and (ii) an order of the Bankruptcy Court granting the Contracts Assignment Motion and authorizing the assumption by the Debtors of certain executory contracts and unexpired non-residential real property leases and the assignment of such executory contracts and unexpired non-residential real property leases to the Buyer (the "Contracts Assignment Order"), all in the manner and subject to the terms and conditions set forth in this Agreement, the Sale Order, and the Contracts Assignment Order and in accordance with Sections 105, 363 and 365 of the Bankruptcy Code and applicable Bankruptcy Rules.

G.      The Debtors believe, after consideration of the available alternatives, that a sale of the Purchased Assets is necessary to maximize value and is in the best interests of the Debtors and their Estates and creditors and other parties in interest.

## AGREEMENT

NOW, THEREFORE, for and in consideration of the premises and the agreements, covenants, representations and warranties hereinafter set forth and other good and valuable consideration, the receipt and adequacy of which are forever acknowledged and confessed, the Parties, intending to be legally bound, hereby agree as follows:

## ARTICLE I.
## DEFINITIONS; RULES OF CONSTRUCTION

1.1      Definitions.  For the purposes of this Agreement, the following capitalized terms shall have the meanings set forth below:

"Accounts Receivable" means all accounts, accounts receivable, rents, receivables, note receivables, promissory notes executed in favor of the Sellers, and any other evidence of indebtedness of or rights to receive payment for goods or services provided by the Sellers in connection with the Business prior to the Closing, billed and unbilled, recorded or unrecorded, with collection agencies or otherwise, including any such items that have been charged off as bad debt, together with all financial and billing records related to the Accounts Receivable.

"Action" means any written action, claim, proceeding, litigation, arbitration, mediation, suit, investigation or regulatory inquiry (whether civil, criminal, administrative or judicial), or any appeal therefrom or any material demand letter threatening the initiation of any of the foregoing.

"Affiliate" means, with respect to any Person (other than the Debtors), (i) any other Person which, directly or indirectly, is in control of, is controlled by, or is under common control with such Person, (ii) any other Person that, directly or indirectly, owns or controls, whether beneficially, or as trustee, guardian or other fiduciary, twenty percent (20%) or more of the equity interests having ordinary voting power in the election of directors of such Person, or (iii) any other Person who is a director, officer, joint venturer, shareholder, member, or partner (a) of such Person, (b) of any subsidiary of such Person, or (c) of any Person described in clause (i) above.  For the purposes of this definition, control of a Person shall mean the power (direct or indirect) to direct or cause the direction of the management and policies of such Person whether through ownership of voting securities, by contract or otherwise.  When used in this Agreement as relating to the Debtors, the term "Affiliate" has the meaning ascribed to such term in Section 101(2) of the Bankruptcy Code.

"Agreement" means this Asset Purchase Agreement (including all Schedules and Exhibits to this Asset Purchase Agreement), as originally executed by the Parties and as this Asset Purchase Agreement may be subsequently amended, restated, modified, or supplemented from time to time in accordance with its terms.

"Alternative Transaction" has the meaning set forth in Section 10.4 of this Agreement.

"Assignment Agreement" has the meaning set forth in Section 5.2(a)(iii) of this Agreement.

"Assumed Contracts" has the meaning set forth in Section 8.1(b) of this Agreement.

"Assumed Liabilities" has the meaning set forth in Section 2.3 of this Agreement.

"Assumption Agreement" has the meaning set forth in Section 5.2(a)(iv) of this Agreement.

"Bankruptcy Case" has the meaning set forth in paragraph B of the Recitals of this Agreement.

"Bankruptcy Code" means title 11 of the United States Code, 11 U.S.C. §§ 101 et seq., as in effect on the Petition Date, together with all amendments and modifications thereto that were subsequently made applicable to the Bankruptcy Case.

"Bankruptcy Court" has the meaning set forth in paragraph B of the Recitals of this Agreement.

"Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure, as promulgated under Section 2075 of title 28 of the United States Code, and the Local Rules, as in effect on the Petition Date, together with all amendments and modifications thereto that were subsequently made applicable to the Bankruptcy Case.

"Bid" has the meaning set forth in Section 8.1(a) of this Agreement.

"Bid Deadline" has the meaning set forth in Section 8.1(a) of this Agreement.

"Bill of Sale" has the meaning set forth in Section 5.2(a)(ii) of this Agreement.

"Break-Up Fee" has the meaning set forth in Section 10.4 of this Agreement.

"Business" has the meaning set forth in paragraph A of the Recitals of this Agreement.

"Business Day" means any day other than (i) a Saturday, a Sunday or a "legal holiday" (as "legal holiday" is defined in Bankruptcy Rule 9006(a)), or (ii) a day on which commercial banks in Orlando, Florida are authorized or required to close by Law.

"Buyer" has the meaning set forth in the Preamble to this Agreement.

"Claim" has the meaning ascribed to such term in Section 101(5) of the Bankruptcy Code. When used in this Agreement, the term "Claim" will be given the broadest possible meaning permitted by applicable Law and will include all manner and type of claim, whenever and wherever such claim may arise.  As used in this Agreement, the term "Claim" also includes a Claim against any Affiliate, the holder of which holds or believes it holds a Claim against the Debtors arising from or related to the same or similar facts and circumstances surrounding the claim against the Affiliate.

"Closing" has the meaning set forth in Section 5.1 of this Agreement.

"Closing Date" has the meaning set forth in Section 5.1 of this Agreement.

"Closing Statement" means the closing settlement statement to be executed by the Sellers and the Buyer on the Closing Date reflecting any amounts payable by or on behalf of the Sellers and the Buyer in connection with the Closing.

"Code" means the Internal Revenue Code of 1986, as amended.

"Communication" has the meaning set forth in Section 11.6 of this Agreement.

"Confidential Information" has the meaning set forth in Section 8.5 of this Agreement.

"Contract" means any written agreement, arrangement, lease, mortgage, contract, purchase order, note, power of attorney, insurance policy, covenant, understanding, commitment or instrument relating to the Business, the Purchased Assets or the operation thereof to which a Seller is a party or by which any of the Purchased Assets are bound.

"Contracts Assignment Motion" has the meaning set forth in Section 8.1(b) of this Agreement.

"Contracts Assignment Order" has the meaning set forth in paragraph F of the Recitals of this Agreement.  The Contracts Assignment Order shall be in a form reasonably acceptable to the Debtors and the Buyer.

"Court Approval" means the entry of the Sale Order and the Contracts Assignment Order by the Bankruptcy Court, together with all other orders of the Bankruptcy Court necessary to consummate the Transaction.

"Cure Amounts" means the amounts determined by a Final Order of the Bankruptcy Court to be necessary to cure all defaults and to pay all actual or pecuniary losses that have resulted from any such defaults on the part of the Debtors under any of the Assumed Contracts as required by Section 365(b)(1) of the Bankruptcy Code.

"Debtors" has the meaning set forth in the Preamble to this Agreement.

"DIP Financing Motion" has the meaning set forth in Section 8.1(d) of this Agreement

"DIP Loan Facility" means the debtor-in-possession revolving credit facility loan provided to the Debtors, as borrowers, by the Buyer, as lender, in the maximum principal amount of Three Hundred Fifty Thousand and 00/100 Dollars ($350,000.00) pursuant to the Financing Orders.

"DIP Loan Obligations" has the meaning set forth in the Interim Financing Order or the Final Financing Order, as the case may be.

4

"Docket" means the docket in the Bankruptcy Case maintained by the Clerk of the Bankruptcy Court.

"Dollars" or "$" means lawful currency of the United States of America.

"Due Diligence Materials" has the meaning set forth in Section 4.3 of this Agreement.

"Due Diligence Period" has the meaning set forth in Section 4.1 of this Agreement.

"Employee Benefit Plan" means every plan, fund, contract, program and arrangement (whether written or not) that is maintained or contributed to by the Sellers (or any member of their "controlled group" as that term is used in Section 414(b) or (c) of the Code) for the benefit of current or former employees of the Sellers, including those intended to provide: (i) medical, surgical, health care, hospitalization, dental, vision, workers' compensation, life insurance, death, disability, legal services, severance, sickness or accident benefits (whether or not defined in Section 3(1) of ERISA); (ii) pension, profit sharing, stock bonus, retirement, supplemental retirement or deferred compensation benefits (whether or not tax qualified and whether or not defined in Section 3(2) of ERISA); (iii) bonus, incentive compensation, member interest option, member interest appreciation right, phantom member interest or member interest purchase benefits; or (iv) salary continuation, unemployment, supplemental unemployment, termination pay, vacation, holiday benefits or material fringe benefits (whether or not defined in Section 3(3) of ERISA).

"Employees" means the individuals employed by the Sellers performing job functions for the Business.

"Environmental Law" means any and all Laws relating to (i) the effect of the environment or Hazardous Materials on human health or emissions, (ii) discharges or Releases of Hazardous Materials into the environment, including ambient air, surface water, groundwater or land, or (iii) the handling of Hazardous Materials, or the clean-up or other remediation thereof.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"Escrow Agent" means the Sellers' counsel, Stichter, Riedel, Blain & Postler, P.A.

"Estates" means the estates created for the Debtors by Section 541 of the Bankruptcy Code upon the commencement of the Bankruptcy Case.

"Excluded Assets" has the meaning set forth in Section 2.2 of this Agreement.

"Execution Date" has the meaning set forth in the Preamble to this Agreement.

"Final Financing Order" means the Final Order of the Bankruptcy Court granting the DIP Financing Motion.

"Final Order" means an order, judgment, ruling, or other decree (or any revision, modification, or amendment thereto) issued and entered by the Bankruptcy Court or by any state or other federal court that has jurisdiction over any proceeding in connection with the Bankruptcy

Case for the purpose of such proceeding, which order, judgment, ruling, or other decree has not been reversed, vacated, stayed, modified, supplemented, or amended and as to which (i) no appeal, petition for review, reargument, rehearing, reconsideration, or certiorari has been taken and is pending and the time for the filing of any such appeal, petition for review, reargument, rehearing, reconsideration, or certiorari has expired, or (ii) such appeal or petition has been heard and dismissed or resolved and the time to further appeal or petition has expired with no further appeal or petition pending.

"Financing Orders" means, collectively, the Interim Financing Order and the Final Financing Order.

"Governance Documents" means, with respect to any entity, all documents (i) pursuant to which the legal existence of the entity is established, (ii) that were adopted or approved by the owners, board of directors, partners, members, managers or other similar management authority of the entity and set forth provisions for the regulation and management of the entity's internal affairs, and (iii) that are binding upon any owners of the entity and establish the governance, economic and/or other rights of such owners in their capacity as such.

"Government Entity" means any federal, state, local or foreign government, court, agency, commission, department or other authority or instrumentality, including any "Governmental Unit" within the meaning of Section 101(41) of the Bankruptcy Code.

"Hazardous Materials" means any waste or other substance of any kind that is listed, defined, designated, classified or regulated under any Environmental Law as hazardous, radioactive or toxic or as a pollutant or contaminant.

"iCore" has the meaning set forth in the Preamble to this Agreement.

"Intellectual Property" means, interchangeably and collectively as the context requires: (i) patents and invention disclosures, including continuations, divisionals, continuations-in-part, renewals and reissues; (ii) trademarks, service marks, trade names, trade dress, designs, logos, emblems, signs or insignia, slogans, domain names and other similar designations of source or origin, together with all goodwill symbolized by the foregoing; (iii) copyrights and copyrightable material; (iv) trade secrets and other confidential information, know-how, customer lists, prospect lists, business plans, inventions, proprietary processes, formulae, algorithms, models and methodologies; (v) rights of publicity and privacy relating to the use of the names, likenesses, voices, signatures and biographical information of natural Persons; (vi) all rights with respect to hardware, software, computer programs, computer program code (including source code and executable code), the algorithms underlying any computer program, documentation associated with any software, data and databases, to the extent not otherwise embodied in the foregoing clauses (i)-(v); (vii) all moral rights and/or rights of attribution and/or integrity in any of the foregoing; (viii) registrations and applications for any of the foregoing; (ix) the right to sue for past infringement or unauthorized use of any of the foregoing; and (x) all other intellectual property.

"Intellectual Property Assignment" has the meaning set forth in Section 5.2(a)(v) of this Agreement.

"Interim Financing Order" means the interim order of the Bankruptcy Court granting the DIP Financing Motion.

"Interim Funding" has the meaning set forth in Section 8.1(d) of this Agreement.

"Knowledge of the Sellers" means the actual knowledge, together with the knowledge that would have been obtained after reasonable inquiry, of Archit Shah, the Chief Financial Officer of the Sellers.

"Law" or "Laws" means all applicable federal, state, local and foreign laws (including common law), codes, constitutions, statutes, rules, regulations, ordinances and policies, and all applicable orders, writs, judgments, arbitration awards, decrees, administrative or judicial promulgations, injunctions, rulings, determinations, agreements with, and rulings of or by any Government Entity.

"Letter of Intent" means that certain letter agreement dated June 20, 2025 by and between the Sellers and the Buyer.

"Liability" means any debt, liability, commitment or obligation of any kind, character or nature whatsoever, whether known or unknown, asserted or unasserted, liquidated or unliquidated, secured or unsecured, monetary or non-monetary, accrued, fixed, absolute, contingent or otherwise, and whether due or to become due.

"Liens" means, with respect to any of the Purchased Assets, all mortgages, claims (including all Claims), leases, options, hypothecations or similar restrictions, liens, pledges, security interests, and charging orders and any other encumbrance, right or interest of any kind or character, whether vested or contingent, that evidences or secures a debt or payment obligation or adverse ownership interest in the Purchased Asset in question, whether imposed by agreement, understanding, law, equity or otherwise, or liens, interests or encumbrances both now existing or hereafter arising which would encumber such Purchased Asset arising under any agreement binding on the Sellers or the Purchased Assets or arising from any act or omission of the Sellers or arising pursuant to any right, title or interest, or any lien or encumbrance which could hereafter be asserted as a result of the transfer of the Purchased Assets by the Sellers, whether voluntary or involuntary and whether arising by law, contract, or otherwise, and shall include "liens" as such term is defined in Section 101(37) of the Bankruptcy Code.

"Local Rules" means the Local Rules of the United States Bankruptcy Court for the Middle District of Florida, as in effect on the Petition Date, together with all amendments and modifications thereto that were subsequently made applicable to the Bankruptcy Case.

"Notice to Proceed" means written notice from the Buyer to the Sellers that the Buyer elects to proceed with the Transaction.

"OFAC" means the Office of Foreign Assets Control.

"Ordinary Course" means the ordinary course of the Sellers' business, consistent with past practice in nature, scope and magnitude, taking into account all limitations imposed by the Bankruptcy Code and the Bankruptcy Rules on the conduct and activities of the Sellers.

"<u>Outside Closing Date</u>" has the meaning set forth in <u>Section 10.1(b)</u> of this Agreement.

"<u>Parties</u>" and "<u>Party</u>" have the meanings set forth in the Preamble to this Agreement.

"<u>Patriot Act</u>" has the meaning set forth in <u>Section 6.13</u> of this Agreement.

"<u>Permitted Liens</u>" means (i) any and all Liens for real estate Taxes, tangible personal property Taxes, assessments and other governmental charges for the calendar year in which the Closing occurs and subsequent years not yet due and payable, (ii) inchoate statutory, mechanics', laborers' and materialmen's Liens arising in the Ordinary Course, (iii) deposits or pledges to secure obligations under worker's compensation, social security or similar laws, or under unemployment insurance or general liability or product liability insurance, (iv) deposits or pledges to secure bids, tenders, contracts (other than contracts for the payment of money), leases, statutory obligations, performance bonds, surety and appeal bonds and other obligations of like nature arising in the Ordinary Course, (v) zoning restrictions, easements, encroachments, rights of way, restrictions, leases, licenses, restrictive covenants and other similar title exceptions or Liens affecting real property, none of which materially impairs the use of such real property or the value thereof, and none of which is violated in any material respect by existing or supporting structures or land use, and (vi) any other matters described or defined as Permitted Liens in this Agreement.

"<u>Person</u>" means any person, individual, sole proprietorship, corporation, association, partnership, limited liability company, joint venture, trust, organization, unincorporated organization, institution, joint stock company, business, government, governmental agency or political subdivision thereof, Government Entity, or any other entity or institution of any type whatsoever, including any "person" as such term is defined in Section 101(41) of the Bankruptcy Code.

"<u>Petition Date</u>" has the meaning set forth in paragraph B of the Recitals of this Agreement.

"<u>Preamble</u>" means the first paragraph of this Agreement.

"<u>Prohibited Person</u>" has the meaning set forth in <u>Section 6.13</u> of this Agreement.

"<u>Purchase Price</u>" has the meaning set forth in <u>Section 3.1</u> of this Agreement.

"<u>Purchased Assets</u>" has the meaning set forth in <u>Section 2.1</u> of this Agreement.

"<u>Rejected Contracts</u>" has the meaning set forth in <u>Section 8.1(b)</u> of this Agreement.

"<u>Release</u>" means a spill, leak, emission, discharge, deposit, dumping or other release into the environment, whether intentional or unintentional.

"<u>Remaining Purchase Price</u>" has the meaning set forth in <u>Section 3.3</u> of this Agreement.

"<u>Representatives</u>" means, with respect to any Person, the directors, officers, members, managers, partners, shareholders, employees, financial advisors, attorneys, accountants, consultants, agents and other authorized representatives of such Person.

"Sale Hearing" means the hearing held by the Bankruptcy Court on the Sale Motion.

"Sale Motion" has the meaning set forth in Section 8.1(a) of this Agreement.

"Sale Order" has the meaning set forth in paragraph F of the Recitals of this Agreement. The Sale Order shall be in a form reasonably acceptable to the Debtors and the Buyer.

"Seller Disclosure Schedules" has the meaning set forth in the first paragraph of Article VI of this Agreement.

"Sellers" has the meaning set forth in the Preamble to this Agreement.

"Successful Bidder" means the Person whose Bid is determined by the Bankruptcy Court to be the highest and best offer for the Purchased Assets at the Sale Hearing.

"Tax" or "Taxes" means all taxes, assessments, charges, duties, fees, levies or other governmental charges (including interest, penalties or additions associated therewith), including income, franchise, capital stock, real property, personal property, tangible, estimated withholding, employment, payroll, social security, unemployment compensation, disability, transfer, sales, use, franchise, excise, gross receipts, value-added and all other taxes of any kind imposed by any Government Entity, whether disputed or not, whether inchoate, accrued, invoiced, levied, or otherwise, and any charges, interest or penalties imposed or that may be imposed thereon by any Government Entity.

"Tax Return" means any return, declaration, report, claim for refund, or information return or statement relating to Taxes of any kind or nature filed or required to be filed, including any schedule or attachment thereto, and including any amendment thereof.

"Total Deposit" has the meaning set forth in Section 3.2 of this Agreement.

"Transaction" has the meaning set forth in paragraph D of the Recitals of this Agreement.

"Transaction Documents" means the agreements, certificates, documents and instruments required to be delivered by the Parties pursuant to this Agreement.

"Transfer Taxes" means sales, use, transfer, recording, documentary, stamp, registration and other similar Taxes or fees in connection with the purchase and sale of the Purchased Assets.

"Transferred Employees" has the meaning set forth in Section 8.3(a) of this Agreement.

1.2    Rules of Construction.  The words "hereof", "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement.  References herein to Articles, Sections, subsections, Schedules, Exhibits and the like are to Articles, Sections and subsections of, or Schedules or Exhibits attached to, this Agreement unless otherwise expressly provided.  The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation".  Unless the context in which used herein otherwise clearly requires, "or" has the inclusive meaning represented by the phrase "and/or".  Defined terms include in the singular number the plural and

in the plural number the singular.  Reference to any agreement, document or instrument means such agreement, document or instrument as amended or modified and in effect from time to time in accordance with the terms thereof, except where otherwise explicitly provided, and reference to any promissory note includes any promissory note which is an extension or renewal thereof or a substitute or replacement therefor.  Reference to any Law, rule, regulation, order, decree, requirement, policy, guideline, directive or interpretation means as amended, modified, codified, replaced or reenacted, in whole or in part, and in effect on the determination date, including rules and regulations promulgated thereunder.  When any reference is made with respect to information, documents or materials being supplied, provided or otherwise made available to a Person or such Person's Representatives, such information, documents, or materials shall be deemed to include any information, documents, or materials supplied, provided or otherwise made available in any written form in connection with this Agreement or the Transaction.  Disclosure made on any Seller Disclosure Schedule attached to this Agreement shall be deemed to have been made on another Seller Disclosure Schedule attached to this Agreement when it is cross-referenced in such other applicable section or Seller Disclosure Schedule or is readily apparent on its face that such a disclosure would belong on such other Seller Disclosure Schedule attached to this Agreement.

## ARTICLE II.
## THE PURCHASE AND SALE

2.1    Purchased Assets.  Subject to the terms, conditions and other provisions of this Agreement, and subject to Court Approval, at the Closing, the Sellers shall grant, sell, assign, transfer and deliver to the Buyer, and the Buyer shall purchase from the Sellers, all right, title and interest in, to and under all assets of every kind, nature and description, whether real, personal or mixed, tangible or intangible, wherever located, owned or held by the Sellers and used in or otherwise relating to the Business as set forth in this Section 2.1, other than the Excluded Assets (collectively, the "Purchased Assets"), free and clear of any and all Liens, other than the Permitted Liens:

(a)    the Accounts Receivable;

(b)    all future cash flow and cash earnings;

(c)    all Intellectual Property, including as set forth on Schedule 6.7 attached to this Agreement;

(d)    all items of intangible property, including the SaaS technology platform, all of its modules, and associated infrastructure that allows full working deployment of Sellers' products;

(e)    all items of tangible personal property consisting of all furniture, fixtures, improvements, furnishings, equipment, machinery, appliances, and other personal property of every kind used in the operation of the Business;

(f)    all inventory (including raw materials, work-in-process, finished goods and supplies);

(g)    the Assumed Contracts;

(h)    all books and records which relate to the Business or the Purchased Assets, but expressly excluding all documents and other materials which (i) are legally privileged or constitute attorney-client work product, or (ii) are subject to any Law or a confidentiality agreement prohibiting their disclosure;

(i)    to the extent transferable under applicable Law (including the Bankruptcy Code), permits, authorizations, approvals, decisions, zoning orders, registrations, licenses, filings, certificates, variances or similar rights issued to the Sellers and used by or in connection with the Business;

(j)    all information regarding the Sellers' past, current and prospective customers and suppliers (including any and all lists thereof (including contact information), purchase and sale history, correspondence, complaints, and any and all other data, reports, and information of any kind kept or maintained by or on behalf of the Sellers), pricing and cost information, and business and marketing plans and proposals;

(k)    except as provided in Section 2.2(a) and Section 2.2(i), all prepayments and prepaid expenses relating to the Business or the Purchased Assets;

(l)    all telephone and facsimile numbers and telephone directory listings, and all websites and domains;

(m)    rights, to the extent assignable, under any agreements in favor of the Sellers or for the benefit of the Sellers with current or former employees, contractors or third parties, with respect to non-competition, non-solicitation, or other restrictive covenants, regardless of whether any such Person accepts an offer of employment from the Buyer or continues to perform services for the Buyer;

(n)    books, records, ledgers, files, documents, correspondence, lists, plans, drawings and specifications, creative materials, sales collateral, advertising and promotional materials, studies, reports, and other printed or written materials, including records related to inventory and maintenance of the Purchased Assets, whether in written or electronic form, other than employment records that may not be transferred pursuant to applicable Law;

(o)    personnel records for Employees who are Transferred Employees;

(p)    all goodwill associated with the Business; and

(q)    all other assets that are necessary to the continued operation of the Business.

2.2    Excluded Assets.  Notwithstanding anything to the contrary contained in this Agreement, the Purchased Assets shall not include the following assets of the Sellers (collectively, the "Excluded Assets"), which shall be retained by the Sellers:

(a)    restricted and unrestricted cash and cash equivalents (including all restricted cash held by or for the benefit of the Sellers), cash accounts (including cash accounts serving as collateral for secured debt, letters of credit, insurance policies or programs), marketable securities and certificates of deposit, deposits and other prepaid amounts made or held on the account of the Sellers with respect to any Contracts (including the Assumed Contracts), utility deposits, temporary investments of cash, and all bank accounts and all electronic fund transfer accounts;

(b)    all amounts due to the Sellers from any other Person who is an Affiliate of the Sellers, including any intercompany accounts;

(c)    all amounts due to the Sellers from any Employee for advances or loans made by the Sellers to such Employee;

(d)    any Contract that is not an Assumed Contract;

(e)    all inventory of the Sellers that is disposed of or exhausted prior to the Closing Date in the Ordinary Course;

(f)    the Sellers' corporate minute books, Governance Documents and tax records, and any other records which the Sellers are required to retain by Law (provided, however, that the Buyer shall be entitled to receive, at its expense, copies of such portions thereof as the Buyer may reasonably request which are related to the Business);

(g)    personnel records for Employees who are not Transferred Employees;

(h)    any and all of the Sellers' or the Estates' actions, claims, demands, rights, defenses, counterclaims, proceedings, suits and causes of action of any value whatsoever, whether known or unknown, in law, equity or otherwise, against any creditor or other third party and the proceeds or benefits thereof, including any and all actions which a trustee, debtor in possession or other appropriate party in interest may assert on behalf of the Debtors or the Estates under Chapter 5 of the Bankruptcy Code, including actions under one or more provisions of Sections 542, 543, 544, 545, 546, 547, 548, 549, 550, 551, and 553 of the Bankruptcy Code or under any other similar applicable federal, state or common law, and the Sellers' claims or causes of action for professional negligence and director and officer liability, but excluding (i) any claim expressly released in writing by the Sellers, and (ii) any claim against the Buyer or any Affiliate of the Buyer other than as expressly provided for in this Agreement;

(i)    any insurance policies and all insurance proceeds and return of insurance premiums arising in connection with the ownership or operation of the Purchased Assets or the Business prior to the Closing;

(j)    all claims, rights, interests and proceeds with respect to refunds of Taxes for periods ending prior to the Closing Date and all rights to pursue appeals of the same;

(k)    any personal property of any Employees of the Sellers;

(l)    any Employee Benefit Plan;

12

(m)    the consideration delivered by the Buyer to the Sellers pursuant to this Agreement;

(n)    any and all rights of the Sellers under this Agreement and the Transaction Documents;

(o)    the proceeds, benefits and other recoveries on account of the foregoing items in subparagraphs (a) through (n); and

(p)    the assets and properties of the Sellers set forth on Schedule 2.2(p) attached to this Agreement.

2.3    Assumed Liabilities.   Subject to the terms, conditions, and other provisions of this Agreement and the Transaction Documents, at and effective as of the Closing, the Buyer shall assume the future payment and performance of (or, if otherwise stated in this Agreement, pay at the Closing) the following Liabilities (collectively, the "Assumed Liabilities"):

(a)    all Liabilities relating to or first arising as a result of the operation of the Business or the ownership of the Purchased Assets on and after the Closing Date, as provided in this Agreement or the Transaction Documents;

(b)    all Liabilities under, arising from or relating to the Assumed Contracts with respect to (i) matters occurring thereunder on or after the Closing Date, and (ii) the Cure Amounts; and

(c)    all Liabilities agreed to be paid by the Buyer pursuant to Section 3.6 of this Agreement.

The Parties' rights and obligations under this Section 2.3 shall survive the Closing.

2.4    Excluded Liabilities.   Notwithstanding anything to the contrary contained in this Agreement, except for the Assumed Liabilities and payment of the Purchase Price, the Buyer shall not assume, agree to pay, discharge or satisfy, or otherwise have any responsibility, liability or obligation for any Liability of the Sellers or any Affiliate of the Sellers.

## ARTICLE III.
## PURCHASE PRICE

3.1    Purchase Price.   Subject to any adjustments expressly set forth in this Agreement, the purchase price to be paid by the Buyer to the Sellers for the Purchased Assets is Eleven Million and 00/100 Dollars ($11,000,000.00) (the "Purchase Price").

3.2    Earnest Money Deposit.   By no later than August 1, 2025, the Buyer shall pay to the Escrow Agent, by wire transfer of immediately available U.S. federal funds to an account designated in writing by the Escrow Agent, an earnest money deposit in the amount of Five Hundred Thousand and 00/100 Dollars ($500,000.00) (the "Total Deposit").  If the Transaction shall be consummated, the Total Deposit shall be applied to the Buyer's obligation to pay the Purchase Price at the Closing as set forth in Section 3.4.  If this Agreement shall be terminated and the Transaction

shall not close or be abandoned, then, in all such events, the Escrow Agent shall refund or disburse the Total Deposit as set forth in Section 4.1, Section 8.3(a), or Section 10.3, as applicable. The Party entitled to the Total Deposit shall also be entitled to the benefit of the interest accruing thereon, if any, and to the extent the Total Deposit is credited to the Purchase Price at Closing the interest accruing thereon shall also be credited to the Purchase Price at Closing.

   3.3  <u>Payment of Remaining Portion of the Purchase Price</u>.  By no later than one (1) day prior to the Closing Date, the Buyer shall pay to the Escrow Agent, by wire transfer of immediately available U.S. federal funds to an account designated in writing by the Escrow Agent, the remaining portion of the Purchase Price (after taking into account the Total Deposit) in the amount of Ten Million Five Hundred Thousand and 00/100 Dollars ($10,500,000.00) (the "<u>Remaining Purchase Price</u>").

   3.4  <u>Payment at Closing</u>.  At the Closing, the Buyer shall pay to the Sellers an amount equal to the Purchase Price (plus or minus any adjustments as expressly set forth in this Agreement), which payment shall be made by the transfer of the Remaining Purchase Price and the Total Deposit to the Sellers by the Escrow Agent <u>less</u> the aggregate amount of any advances under the DIP Loan Facility plus any other DIP Loan Obligations (which amount shall reduce the Purchase Price and be refunded to the Buyer).

   3.5  <u>Transfer Taxes</u>.  To the extent any Liability exists for any Transfer Taxes, including documentary stamp taxes, imposed in connection with the purchase and sale of the Purchased Assets and the Assumed Liabilities, the Sellers shall pay and be solely responsible for all such Transfer Taxes.

   3.6  <u>Prorations of Personal Property Taxes or Utilities</u>.  Personal property taxes with respect to the Purchased Assets or utility services with respect to the Business shall be prorated between the Buyer and the Sellers as of the Closing Date.

   3.7  <u>Allocation of Purchase Price</u>.  Prior to the Closing, the Parties shall attempt in good faith to agree upon a mutually satisfactory allocation of the Purchase Price among the Purchased Assets.  If, by the Closing, the Parties are unable to agree on a mutually satisfactory allocation of the Purchase Price among the Purchased Assets, the same shall not be deemed a failure of any condition to Closing and each Party may use its own allocation for purposes of all of its federal, state and local Tax Returns and related tax documents reporting the Transaction.

   3.8  <u>Escrow Agent Provisions</u>.  By its execution of an acknowledgment page to this Agreement, the Escrow Agent hereby accepts its designation as the escrow agent with respect to the Total Deposit, and agrees to hold, invest and disburse the Total Deposit as provided in this Agreement.  The Escrow Agent shall not be liable for any acts taken in good faith, shall only be liable for its willful default or action or gross negligence, and may, in its sole discretion, rely in good faith upon the written notices, communications, orders or instructions given by the Sellers or the Buyer; <u>provided</u>, <u>however</u>, that if any notice or correspondence is not executed by both the Sellers and the Buyer, the Escrow Agent shall give to the Sellers or the Buyer, as the case may be, copies of any notice or correspondence received from the other and shall not take any actions with regard thereto for five (5) Business Days following the giving of such notice.  The Escrow Agent shall hold and disburse the Total Deposit in accordance with the provisions of this Agreement.  In

the event of a disagreement between the Sellers and the Buyer as to the proper disbursement of the Total Deposit, the Escrow Agent reserves the right to deposit said funds with the Bankruptcy Court by filing an interpleader action, and the Escrow Agent shall thereupon be discharged from its obligations hereunder and shall be entitled to reimbursement from the Sellers and the Buyer for all attorney's fees incurred and court costs expended in connection therewith.  The Sellers and the Buyer hereby agree to indemnify and hold harmless the Escrow Agent and its attorneys against any and all losses, claims, damages, liabilities and expenses which may be incurred by the Escrow Agent and its attorneys in connection with the Escrow Agent's acceptance of this appointment as the Escrow Agent or the performance of its duties as the Escrow Agent hereunder; provided, however, that if the Escrow Agent or its attorneys shall be found guilty of willful default or action or gross negligence, then, in such event, the Escrow Agent shall bear all such losses, claims, damages, liabilities and expenses.  In the event the Escrow Agent places the Total Deposit with the Bankruptcy Court, upon the delivery of same to the prevailing Party, whether by court order or otherwise, the non-prevailing Party shall pay to the prevailing Party at the time of such delivery, interest on said monies at the publicly announced prime rate of Bank of America, N.A., as such rate may change from time to time, said interest to run from the date of deposit with the Bankruptcy Court until delivery of same to the prevailing Party, and notwithstanding any contrary provision contained herein, pay to the Escrow Agent all monies necessary to reimburse the Escrow Agent for any losses, claims, damages, liabilities and expenses incurred by the Escrow Agent in connection with its appointment as the Escrow Agent or the performance of its duties as the Escrow Agent hereunder.

## ARTICLE IV.
## DUE DILIGENCE INVESTIGATION

4.1    Due Diligence Contingency.  The Buyer shall have until 11:59 p.m. (Eastern Standard Time) on Sunday, July 27, 2025 (the "Due Diligence Period"), to perform its due diligence review of the Sellers, the Business, and the Purchased Assets and all matters related thereto which the Buyer deems necessary or advisable, in its sole and absolute discretion, to determine the feasibility of the Buyer's acquisition of the Purchased Assets, including any business, technology, availability / continued employment of the key employees of the Sellers, customers and vendors, management, environmental, employee benefits, financial, operational, sales and marketing, competitive, valuation, and legal compliance matters.  If, prior to the expiration of the Due Diligence Period, the Buyer, in its sole and absolute discretion for any reason or no reason, does not deliver the Notice to Proceed to the Sellers, then (i) this Agreement shall terminate, (ii) the Total Deposit together with accrued interest thereon, if any, shall be refunded to the Buyer by the Escrow Agent within one (1) Business Day following the expiration of the Due Diligence Period, and (iii) the Parties shall have no further rights or obligations under this Agreement except those which are expressly stated in this Agreement to survive such termination.  If the Buyer delivers the Notice to Proceed to the Sellers on or before the expiration of the Due Diligence Period, the Buyer shall be deemed to have irrevocably elected to proceed with the acquisition of the Purchased Assets contemplated by this Agreement and the Total Deposit shall thereupon become non-refundable to the Buyer except as otherwise expressly set forth in this Agreement.  Notwithstanding anything to the contrary contained in this Agreement, if, at any time prior to the expiration of the Due Diligence Period, the Buyer, in its sole and absolute discretion, delivers to the Sellers written notification that the Buyer elects to terminate this Agreement for any reason or no reason, then this Agreement shall immediately terminate, whereupon the Total Deposit together with accrued interest thereon, if any,

shall be refunded to the Buyer by the Escrow Agent within one (1) Business Day following receipt of the Buyer's notice of termination and the Parties shall have no further rights or obligations under this Agreement except those which are expressly stated in this Agreement to survive such termination.

     4.2    Due Diligence Access.  The Sellers agree to provide to the Buyer full access to the assets, financial records, and documents of the Sellers and the Sellers' executive management and leadership team (CEO, CFO, CTO, CMO and COO), as well as to the Sellers' independent auditors and legal counsel.  The Buyer will not contact any customers, vendors, or non-executive management of the Sellers with respect to the Sellers or the Transaction without the prior written approval of the Sellers, which shall not be unreasonably withheld or delayed.  During the Due Diligence Period, the Sellers agree to provide the Buyer full access to perform its due diligence.

     4.3    Due Diligence Materials.  Within two (2) days after the Execution Date, the Sellers shall provide to the Buyer, to the extent not already provided, all documents and materials in the Sellers' possession relating to the Business and the Purchased Assets. All documents and materials provided by the Sellers to the Buyer pursuant to this Agreement, together with any copies or reproductions of such documents or materials, or any summaries, abstracts, compilations or other analyses made by or for the Buyer based on the information in such documents or materials, are referred to collectively herein as the "Due Diligence Materials".  If this Agreement is terminated, the Buyer promptly shall (i) return or, if requested by the Sellers, destroy all Due Diligence Materials in its possession, and (ii) cause all Persons to whom the Buyer has provided any Due Diligence Materials to return or, if requested by the Sellers, destroy all Due Diligence Materials in their possession.

**ARTICLE V.**
**CLOSING**

     5.1    Closing.  Subject to Section 10.1(b), the closing of the Transaction (the "Closing") shall occur no later than the fifteenth (15th) day following the day upon which all of the conditions precedent to Closing set forth in Article IX of this Agreement have been satisfied or waived (other than those conditions precedent which by their terms cannot be satisfied until the Closing but subject to the fulfillment or waiver of those conditions precedent), or such other date as the Parties may mutually determine.  In the event that all of the conditions precedent to Closing set forth in Article IX of this Agreement have been satisfied or waived on or before September 30, 2025, then the Parties shall be required to close by no later than September 30, 2025.  The date on which the Closing actually occurs is referred to herein as the "Closing Date".  The Closing shall take place remotely via the exchange of signatures, documents and funds at a time and on a date mutually designated by the Parties.  The Closing shall take effect as of 12:01 a.m. prevailing Orlando, Florida time on the Closing Date, it being acknowledged and agreed by the Parties that the results of operations of the Sellers and the Business up to the day prior to the Closing Date shall be for the Sellers' account, and the results of operations of the Purchased Assets will be for the Buyer's account beginning on the Closing Date.

16

5.2    <u>Closing Deliveries</u>.

(a)    At the Closing, the Sellers shall duly execute and/or deliver, or cause to be duly executed and/or delivered, in a form and substance reasonably acceptable to the Buyer:

(i)    a certificate executed by a duly authorized officer of each of the Sellers as to the satisfaction by the Sellers of the conditions in <u>Section 9.1(a)</u> and <u>Section 9.1(b)</u> of this Agreement;

(ii)    a quitclaim bill of sale from the Sellers with respect to all of the Purchased Assets, substantially in the form attached to this Agreement as <u>Exhibit A</u> (the "<u>Bill of Sale</u>");

(iii)    an assignment and assumption agreement from the Sellers with respect to all of the Assumed Contracts, substantially in the form attached to this Agreement as <u>Exhibit B</u> (the "<u>Assignment Agreement</u>");

(iv)    an assumption agreement from the Sellers providing for the assumption of the Assumed Liabilities by the Buyer, substantially in the form attached to this Agreement as <u>Exhibit C</u> (the "<u>Assumption Agreement</u>");

(v)    an assignment agreement from the Sellers with respect to all of the Sellers' interest in and to the Intellectual Property, substantially in the form attached to this Agreement as <u>Exhibit D</u> (the "<u>Intellectual Property Assignment</u>");

(vi)    the Closing Statement;

(vii)    a certificate, dated as of the Closing Date, and signed by a duly authorized officer of each of the Sellers, certifying as to (A) the authenticity of the signatures of each officer or other representative of the Sellers executing this Agreement and all other Transaction Documents to which it is a party on behalf of the Sellers, and (B) the resolutions of the board of directors of each of the Sellers authorizing the execution, delivery, and performance of this Agreement and all other Transaction Documents to which it is a party (a copy of which resolutions shall be attached to such certificate), including that such resolutions are true and correct, are in full force and effect, and have not been rescinded, modified, amended or supplemented; and

(viii)    Lien release and termination documentation of all Liens on any of the Purchased Assets, other than the Permitted Liens.

(b)    At the Closing, the Buyer shall duly execute and/or deliver, or cause to be duly executed and/or delivered, in a form and substance reasonably acceptable to the Sellers:

(i)    any portion of the Purchase Price that is required to be delivered at the Closing (including the payment of any Assumed Liabilities which are due and payable at the Closing);

(ii)     a certificate executed by a duly authorized manager of the Buyer as to the satisfaction by the Buyer of the conditions in <u>Section 9.2(a)</u> and <u>Section 9.2(b)</u> of this Agreement;

(iii)    the Assignment Agreement;

(iv)    the Assumption Agreement;

(v)     the Intellectual Property Assignment;

(vi)    the Closing Statement;

(vii)   a certificate of good standing (dated not more than ten (10) days prior to the Closing Date) of the Buyer from its jurisdiction of incorporation or organization; and

(viii)  a certificate, dated as of the Closing Date, and signed by the manager of the Buyer, certifying as to (A) the authenticity of the signatures of each officer or other representative of the Buyer executing this Agreement and all other Transaction Documents to which it is a party on behalf of the Buyer, (B) the resolutions of the board of managers of the Buyer authorizing the execution, delivery, and performance of this Agreement and all other Transaction Documents to which it is a party (a copy of which resolutions shall be attached to such certificate), including that such resolutions are true and correct, are in full force and effect, and have not been rescinded, modified, amended or supplemented, and (C) the articles of organization and operating agreement of the Buyer.

(c)     At the Closing, each Party shall execute and deliver such other instruments of transfer and/or assignment, certificates, bills of sale, evidence of filing and/or recording, and other documents as are required pursuant to the terms of this Agreement or applicable Law or are reasonably necessary to effectuate the Transaction.

## ARTICLE VI.
## <u>REPRESENTATIONS AND WARRANTIES OF THE SELLERS</u>

Except as expressly set forth in the Disclosure Schedules attached to this Agreement pursuant to this <u>Article VI</u> and incorporated by reference herein (the "<u>Seller Disclosure Schedules</u>"), as of the Execution Date and as of the Closing Date, the Sellers represent and warrant to the Buyer the following:

6.1     <u>Existence and Capacity</u>.  iCore is a corporation duly organized, validly existing and in good standing under the Laws of the State of Delaware.  Midco is a corporation duly organized, validly existing and in good standing under the Laws of the State of Nevada.  Each of the Sellers has the requisite corporate power and corporate authority to own, operate or lease the properties and assets now owned, operated or leased by it and to carry on the Business as currently conducted by such Seller.

6.2     <u>Authority: Binding Agreement</u>.  Each of the Sellers has all requisite corporate power and corporate authority, and has taken all corporate action necessary, to execute, deliver and

perform this Agreement and the Transaction Documents to which it is a party, to consummate the transactions contemplated herein and therein, and to perform its obligations hereunder and thereunder. The execution and delivery by each Seller of this Agreement and the Transaction Documents to which it is a party and the consummation by such Seller of the transactions contemplated herein and therein have been duly authorized and approved by all requisite corporate action on the part of such Seller, none of which actions have been modified or rescinded and all of which remain in full force and effect. Except for Court Approval, no other proceedings on the part of either Seller are necessary to authorize the execution and delivery by such Seller of this Agreement and the Transaction Documents to which it is a party and the consummation by such Seller of the transactions contemplated herein and therein. This Agreement and the Transaction Documents to which each Seller is a party have been, or upon execution thereof by such Seller will be, duly executed and delivered by such Seller and, assuming the due authorization, execution and delivery by the Buyer of this Agreement and the Transaction Documents to which the Buyer is a party, are, or will be, the legal, valid and binding obligations of such Seller and enforceable against such Seller in accordance with their respective terms, subject to Court Approval and except as enforcement may be limited by (i) applicable bankruptcy, insolvency, reorganization, moratorium and other Laws of general application affecting enforcement of creditors' rights generally, and (ii) Laws relating to the availability of specific performance, injunctive relief, or other equitable remedies.

6.3     Noncontravention. Subject to Court Approval and the requirements of the Bankruptcy Case, the execution, delivery, and performance of this Agreement by each of the Sellers and the consummation of the Transaction by each of the Sellers: (i) do not require any approval or consent of, or filing with, any Government Entity bearing on the validity of this Agreement which is required by Law or the approval of any other third party; (ii) will neither conflict with, nor result in any breach, default (with or without notice or lapse of time or both) or contravention of, or the creation of any Lien under, or result in the acceleration of, or create in any party the right to accelerate, terminate, modify or cancel any material Contract to which either Seller is a party or by which either Seller is bound; (iii) will not violate any Laws of any Government Entity to which the Sellers or the Purchased Assets may be subject; or (iv) will not violate any provision of the articles of incorporation, bylaws, or other organizational documents of the Sellers.

6.4     No Brokers. No investment banker, broker, finder or financial intermediary has been retained by or is authorized to act on behalf of the Sellers or any of their Affiliates, or is entitled to any brokerage fees, finder's fees or commissions based upon arrangements made by or on behalf of the Sellers or any of their Affiliates, in connection with the Transaction.

6.5     Title to Purchased Assets. Each of the Sellers has good and marketable title to, or in the case of leased or licensed assets, valid leasehold interests or licenses to, the Purchased Assets owned, leased or licensed by it, free and clear of all Liens, except for the Permitted Liens. At the Closing, the Sellers will assign and convey to the Buyer title to the Purchased Assets free and clear of all Liens except the Permitted Liens and the Assumed Liabilities.

6.6     Tax Matters. Each of the Sellers has filed all Tax Returns required to have been filed by such Seller. All such Tax Returns were correct and complete in all material respects. Except as disclosed in the Bankruptcy Case, all Taxes owed or required to be withheld by the Sellers (whether or not shown on any Tax Return) have been paid or withheld. No Purchased Assets are

subject to any Lien that arose in connection with any failure (or alleged failure) to pay any Tax, except for the Permitted Liens.

6.7     Intellectual Property.  Schedule 6.7 attached to this Agreement lists all Intellectual Property currently owned or licensed by the Sellers and used in the operation of the Business.  To the Knowledge of the Sellers, the Sellers own, or have good and valid licenses to use, all Intellectual Property used in the operation of the Business.  To the Knowledge of the Sellers, the Sellers, by conducting the Business as currently conducted, have not infringed and do not infringe upon, misappropriate or otherwise violate the Intellectual Property rights of any Person, and no Person has infringed, misappropriated, diluted or otherwise violated, or is currently infringing, misappropriating, diluting or otherwise violating, any of the Sellers' Intellectual Property.

6.8     Real Property.  The Sellers do not own any real property or lease any real property from a third party.

6.9     Litigation.  Schedule 6.9 attached to this Agreement is an accurate list of all pending Actions with respect to the Sellers, the Business, and the Purchased Assets.

6.10    Insurance.  Set forth on Schedule 6.11 attached to this Agreement is a complete and accurate list of all insurance policies held or maintained by, on behalf of, or for the benefit of the Sellers.  All such insurance coverage shall remain in effect through the Closing.

6.11    Employment Matters.  No Employee or group of Employees has communicated to the Sellers any plans or intention to terminate employment with the Sellers, or taken or, to the Knowledge of the Sellers, threatened to take any legal action against the Sellers, the Buyer or any of their respective Affiliates in connection with the Transaction or any other matter whatsoever. The Sellers are not a party to or bound by any collective bargaining agreement, nor have theythey experienced any strikes, grievances, claims of unfair labor practices or other collective bargaining disputes.  There is not now any, and during the past three (3) years there has been no, organizational effort made or, to the Knowledge of the Sellers, threatened by or on behalf of any labor union with respect to the Employees.

6.12    Patriot Act; OFAC Certification.  Neither the Sellers nor any of their Affiliates, nor, to the Knowledge of the Sellers, any of their respective brokers or other agents acting in any capacity in connection with the Transaction contemplated by this Agreement, is or will be (a) conducting any business or engaging in any transaction or dealing with any Person appearing on the U.S. Treasury Department's OFAC list of prohibited countries, territories, "specifically designated nationals" or "blocked persons" (each, a "Prohibited Person") (which lists can be accessed at the following web address:  http://www.ustreas.gov/offices/enforcement/ofac/), including the making or receiving of any contribution of funds, goods or services to or for the benefit of any such Prohibited Person; (b) engaging in certain dealings with countries and organizations designated under Section 311 of the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, as amended (the "Patriot Act") as warranting special measures due to money laundering concerns; (c) dealing in, or otherwise engaging in any transaction relating to, any property or interests in property blocked pursuant to Executive Order No. 13224 on Terrorist Financing dated September 24, 2001, relating to "Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to

Commit, or Support Terrorism"; (d) a foreign shell bank or any Person that a financial institution would be prohibited from transacting with under the Patriot Act; or (e) engaging in or conspiring to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempting to violate, any of the prohibitions set forth in (i) any United States anti-money laundering law, (ii) the Foreign Corrupt Practices Act, (iii) the United States mail and wire fraud statutes, (iv) the Travel Act, (v) any similar or successor statutes, or (vi) any regulations promulgated under the foregoing statutes.

## ARTICLE VII.
## REPRESENTATIONS AND WARRANTIES OF THE BUYER

As of the Execution Date and as of the Closing Date, the Buyer represents and warrants to the Sellers the following:

7.1     Organization.  The Buyer is a limited liability company duly organized, validly existing and in good standing under the Laws of the State of North Dakota.   The Buyer has the requisite power and authority to enter into this Agreement, to perform its obligations hereunder, and to conduct its business as now being conducted.

7.2     Authority; Binding Agreement.   The Buyer has all requisite limited liability company power and limited liability company authority, and has taken all limited liability company action necessary, to execute, deliver and perform this Agreement and the Transaction Documents to which it is a party, to consummate the transactions contemplated herein and therein, and to perform its obligations hereunder and thereunder.  The execution and delivery by the Buyer of this Agreement and the Transaction Documents to which it is a party and the consummation by the Buyer of the transactions contemplated herein and therein have been duly authorized and approved by all requisite limited liability company action on the part of the Buyer, none of which actions have been modified or rescinded and all of which remain in full force and effect.   No other proceedings on the part of the Buyer are necessary to authorize the execution and delivery by the Buyer of this Agreement and the Transaction Documents to which it is a party and the consummation by the Buyer of the transactions contemplated herein and therein.   This Agreement and the Transaction Documents to which the Buyer is a party have been, or upon execution thereof by the Buyer will be, duly executed and delivered by the Buyer and, assuming the due authorization, execution and delivery by the Sellers of this Agreement and the Transaction Documents to which the Sellers are a party, are, or will be, the legal, valid and binding obligations of the Buyer and enforceable against the Buyer in accordance with their respective terms, except as enforcement may be limited by (i) applicable bankruptcy, insolvency, reorganization, moratorium and other Laws of general application affecting enforcement of creditors' rights generally, and (ii) Laws relating to the availability of specific performance, injunctive relief, or other equitable remedies.

7.3     Noncontravention.  The execution, delivery, and performance of this Agreement by the Buyer and the consummation of the Transaction by the Buyer: (i) do not require any approval or consent of, or filing with, any Government Entity bearing on the validity of this Agreement which is required by Law or the approval of any other third party; (ii) will neither conflict with, nor result in any breach, default (with or without notice or lapse of time or both) or contravention of, or the creation of any Lien under, or result in the acceleration of, or create in any party the right to accelerate, terminate, modify or cancel any material contract to which the Buyer is a party or by

which the Buyer is bound; (iii) will not violate any Laws of any Government Entity to which the Buyer or any of its assets or properties may be subject; or (iv) will not violate any provision of the articles of organization, operating agreement, or other organizational documents of the Buyer.

7.4    No Brokers.  No investment banker, broker, finder or financial intermediary has been retained by or is authorized to act on behalf of the Buyer or any of its Affiliates, or is entitled to any brokerage fees, finder's fees or commissions based upon arrangements made by or on behalf of the Buyer or any of its Affiliates, in connection with the Transaction.

7.5    Regulatory Compliance.  The Buyer is in compliance in all material respects with all applicable Laws and requirements of the Government Entities having jurisdiction over the Buyer and the operations of the Buyer.

7.6    Patriot Act; OFAC Certification.  Neither the Buyer nor any of its Affiliates, nor any of their respective brokers or other agents acting in any capacity in connection with the Transaction contemplated by this Agreement, is or will be (a) conducting any business or engaging in any transaction or dealing with any Prohibited Person (a list of which can be accessed at the following web address: http://www.ustreas.gov/offices/enforcement/ofac/), including the making or receiving of any contribution of funds, goods or services to or for the benefit of any such Prohibited Person; (b) engaging in certain dealings with countries and organizations designated under Section 311 of the Patriot Act as warranting special measures due to money laundering concerns; (c) dealing in, or otherwise engaging in any transaction relating to, any property or interests in property blocked pursuant to Executive Order No. 13224 on Terrorist Financing dated September 24, 2001, relating to "Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism"; (d) a foreign shell bank or any Person that a financial institution would be prohibited from transacting with under the Patriot Act; or (e) engaging in or conspiring to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempting to violate, any of the prohibitions set forth in (i) any United States anti-money laundering law, (ii) the Foreign Corrupt Practices Act, (iii) the United States mail and wire fraud statutes, (iv) the Travel Act, (v) any similar or successor statutes, or (vi) any regulations promulgated under the foregoing statutes.

## ARTICLE VIII.
## ADDITIONAL AGREEMENTS

8.1    Bankruptcy Matters.

(a)    By no later than July 28, 2025, the Debtors shall file with the Bankruptcy Court a motion to seek an order authorizing the sale of substantially all of their assets to the Buyer pursuant to Section 363 of the Bankruptcy Code, free and clear of all liens, claims and encumbrances (the "Sale Motion").  The Sale Motion shall include an executed copy of this Agreement.  The Sale Motion shall request that the Bankruptcy Court set a deadline of August 22, 2025 (the "Bid Deadline") for any other Person to submit a competing bid (a "Bid") for the Purchased Assets.  Any and all other Bids shall be in the amount of at least Eleven Million One Hundred Thousand and 00/100 Dollars ($11,100,000.00) plus the amount of the Break-Up Fee and be accompanied by (i) a redlined version of this Agreement indicating any changes of such bidder to this Agreement, (ii) a deposit in the amount of Five Hundred Thousand and 00/100 Dollars

($500,000.00) which has been paid to the Escrow Agent, by wire transfer of immediately available U.S. federal funds to an account designated in writing by the Escrow Agent, which deposit shall be fully refundable to such bidder if it is not the Successful Bidder, and (iii) sufficient financial information that such bidder can close on its Bid. If any Bids meeting the foregoing requirements are received by the Bid Deadline, then the Debtors shall request, on an emergency basis, that the Bankruptcy Court schedule an auction for the Purchased Assets (at which the Buyer may submit additional bids) and, within one (1) Business Day thereafter, conduct the Sale Hearing to determine the highest and best offer for the Purchased Assets.

(b)      By no later than August 8, 2025, the Debtors shall file with the Bankruptcy Court a motion authorizing the Debtors to assume and/or assign certain executory contracts and unexpired leases to the Buyer pursuant to Section 365 of the Bankruptcy Code, free and clear of all liens, claims and encumbrances (the "Contracts Assignment Motion"). The Debtors agree to (i) assume in the Bankruptcy Court and assign to the Buyer any Contract that is designated in writing by the Buyer to the Debtors on or before August 8, 2025 (collectively, the "Assumed Contracts"), and (ii) reject in the Bankruptcy Case any Contract that is not an Assumed Contract (collectively, the "Rejected Contracts"). The Buyer shall assume all of the Assumed Contracts. The list of the Assumed Contracts and the Rejected Contracts shall together comprise all of the Contracts to which the Debtors are a party, and any Contract which is not an Assumed Contract (or subject to a pending motion to become an Assumed Contract) will be a Rejected Contract; provided, however, that in the event a Contract for insurance or indemnity in favor of the Debtors exists and the Buyer does not designate such Contract as an Assumed Contract, such Contract for insurance or indemnity benefits shall remain in force. Assumption and assignment of the Assumed Contracts shall include any ancillary or related agreements, or rights appurtenant thereto, pursuant to which the Debtors have rights or licenses granted in connection with or under the Assumed Contracts, so long as such ancillary or related agreements do not create additional obligations of the Debtors or the Buyer beyond those set out in the Assumed Contracts (unless the Buyer subsequently agrees to such obligations). The Buyer shall be responsible for and shall pay all Cure Amounts in connection with the assumption and assignment of any Assumed Contract to the Buyer. Pursuant to Section 365 of the Bankruptcy Code, and as requested by parties to the Assumed Contracts and required by the Bankruptcy Court, the Buyer shall provide adequate assurance of future performance under and with respect to the Assumed Contracts. After the Closing Date, the Debtors shall be released from any further Liability under the Assumed Contracts as provided for under Section 365(k) of the Bankruptcy Code.

(c)      The Parties shall use their best efforts to have each of the Sale Order and the Contracts Assignment Order entered by the Bankruptcy Court by no later than two (2) days following the date of the Sale Hearing.

(d)      Subject to Bankruptcy Court approval, the Buyer may, in its sole discretion, provide interim funding to the Debtors in an amount up to Three Hundred Fifty Thousand and 00/100 Dollars ($350,000.00) (the "Interim Funding") to support the operations of the Sellers pending the Closing. By no later than August 8, 2025, the Buyer shall provide a term sheet to the Debtors setting forth the terms for the Interim Funding. Upon agreement to the terms for the Interim Funding, which shall be no later than August 14, 2025, the Debtors will file a motion with the Bankruptcy Court to seek approval of the Interim Funding (the "DIP Financing Motion"). Any Interim Funding provided shall be applied as a credit to the Purchase Price at the Closing as

provided in Section 3.4. If the Buyer does not close the Transaction for any reason, any Interim Funding provided pursuant to a Financing Order shall be entitled to administrative expense priority status in the Bankruptcy Case and treated *pari pasu* with all other allowed administrative expense claims.

8.2    Pre-Closing Covenants. The Parties agree as follows with respect to the period between the Execution Date and the Closing Date:

(a)    Each of the Parties shall use its reasonable best efforts to take all actions and to do all things necessary, proper, or advisable in order to consummate and make effective the Transaction contemplated by this Agreement.

(b)    From the Execution Date until the Closing Date, except as otherwise contemplated by this Agreement, authorized by an order of the Bankruptcy Court or to the extent the Buyer shall otherwise consent in writing, and subject to the requirements of the Bankruptcy Case, the Sellers shall: (i) conduct the Business in the Ordinary Course, (ii) make no transfers of any of the Purchased Assets, and (iii) use commercially reasonable efforts to maintain and preserve intact the organization and advantageous business relationships of the Business.

(c)    The Sellers shall permit Representatives of the Buyer to have reasonable access, at all reasonable times, upon reasonable notice, and in a manner so as not to interfere with the normal business operations of the Sellers, to all premises, properties, personnel, books, records, and Contracts of or pertaining to the Sellers, and shall furnish the Representatives of the Buyer with all information of or pertaining to the Sellers as they may reasonably request.

(d)    Each Party shall give prompt written notice to the other Party of any event, occurrence, change, effect, development, circumstance, or condition hereafter arising or discovered, which would or would be reasonably expected to cause a breach of any of the representations and warranties set forth in Article VI or Article VII, as the case may be. No such notice shall be deemed to prevent or cure any misrepresentation, breach of warranty or breach of covenant, or have any effect for the purpose of determining the satisfaction of the conditions to Closing set forth in Article IX.

8.3    Employee Matters.

(a)    Prior to the Closing, the Buyer shall identify those Employees to whom the Buyer desires to offer employment. The terms of such employment shall be as the Buyer shall determine in its sole discretion. The Sellers shall use their commercially reasonable efforts to assist the Buyer in (i) the identification of Employees the Buyer may desire to hire, (ii) facilitating meetings between the Buyer and such Employees, and (iii) transferring any rights of the Sellers under any contract with any third party employer of such Employees to the extent necessary or desirable for the Buyer to hire such Employees to the extent the Buyer elects to do so. Prior to the Closing, the Buyer will provide the Sellers with a list of the Employees to whom the Buyer has made an offer of employment that has been accepted to be effective upon the Closing (the "Transferred Employees"). Effective as of the Closing, the Sellers agree to terminate the employment of all of the Transferred Employees. Notwithstanding the expiration of the Due Diligence Period, it shall be a condition precedent to the Buyer's obligation to consummate the

Closing that the Buyer shall have entered into binding employment agreements, in form and substance acceptable to the Buyer in its sole discretion, with the Chief Financial Officer, Chief Technology Officer, Chief Operating Officer , and Vice President of Business Development of the Sellers.  If such employment agreements are not fully executed on or before the Closing Date, the Buyer shall have no obligation to proceed with the Closing, and the Total Deposit shall be promptly returned to the Buyer in full, without deduction or offset.

(b)      The Sellers will pay, in the Ordinary Course of their business payroll practices, all obligations owed to Employees through the day prior to the Closing Date, including all salary, wage, bonus, paid time off, benefits, overtime, taxes, and other compensation or other amounts payable to or with respect to the Employees.  The Sellers will be solely liable for all workers' compensation claims made by any of the Transferred Employees based on events or circumstances first occurring prior to the Closing, and the Buyer will be solely liable for all such claims made by any of the Transferred Employees based on events or circumstances first occurring after the Closing.  From the Execution Date to the Closing Date, the Sellers shall not make any future commitments for bonuses, commissions, pay hikes or salary increases, or increase any of their current obligations with regards to any employee benefits and programs.

(c)      As of 11:59 p.m. on the day before the Closing Date, all Transferred Employees shall cease participation in all Employee Benefit Plans of the Sellers.  Beginning at 12:01 a.m. on the Closing Date, the Buyer will provide employee benefit coverage for all Transferred Employees under new or existing plans sponsored by the Buyer.  The Sellers will remain solely liable and the Buyer will not assume or otherwise have any Liabilities for any contributions or benefits due with respect to any period prior to the Closing under any of the Sellers' Employee Benefit Plans.

(d)      Nothing in this <u>Section 8.3</u>, whether express or implied, confers upon any Employee or any other Person any rights or remedies, including any right to employment or recall, or any right to claim any particular compensation, benefit or aggregation of benefits, of any kind or nature whatsoever.

8.4     <u>Expenses</u>.  Regardless of whether the Transaction contemplated by this Agreement is consummated, and except as otherwise expressly provided in this Agreement, each of the Parties shall pay all of its expenses relating to the Transaction contemplated by this Agreement, including the fees and expenses of its Representatives.

8.5     <u>Publicity; Confidentiality</u>.  A Party may only issue a press release or make a public statement concerning this Agreement and the Transaction if such press release or public statement is made in form and substance, and at a time, to which all other Parties have consented after good faith consultation, subject to the Debtors' obligations arising in the Bankruptcy Case.  Following the Closing, no Party shall unreasonably withhold its consent regarding the general announcement of the purchase and sale contemplated hereunder.  Otherwise, no Party shall make any public disclosure concerning this Agreement, the Transaction, or the existence of and/or particulars of any negotiations related hereto, including the terms, conditions, consideration to be paid or other facts related to this Agreement, except to the extent that public disclosure is required by applicable Law or is otherwise made to a Government Entity or the Bankruptcy Court, in which case, to the extent practicable, the Parties will use their reasonable best efforts to reach mutual agreement on disclosure

language prior to making such disclosure. The Parties will, and will cause their Representatives to, maintain in confidence all written information obtained in confidence from the other Party in connection with this Agreement or the Transaction (the "Confidential Information"), unless the use or disclosure of such Confidential Information is reasonably necessary in connection with (a) obtaining any approval; (b) the Bankruptcy Case; (c) negotiations with the holders of the Sellers' debt and other obligations (and each of the foregoing party's Representatives) and applicable Government Entities; (d) the negotiation of the terms of this Agreement or the Transaction; or (e) a valid court order. Notwithstanding the foregoing, the Debtors may disclose this Agreement and the Transaction in the Sale Motion and the Contracts Assignment Motion. Confidential Information shall not include information that is or becomes publicly known through no wrongful act of any Party.

8.6    Preservation and Access to Records After Closing.  After the Closing, the Sellers and the Buyer shall each keep and preserve in their original form all records of the Business existing as of the Closing, and which constitute a part of the Excluded Assets or the Purchased Assets.  For purposes of this Agreement, the term "records" includes all documents, electronic data and other compilations of information in any form.  The Buyer will allow the Sellers and their Representatives access to the records transferred to the Buyer at the Closing, consistent with the provisions of Section 8.2(c).

8.7    Cooperation on Tax Matters.  Following the Closing, the Parties shall reasonably cooperate with each other and shall make available to one another, as reasonably requested and at the expense of the requesting party, and to any taxing authority, any information which may be relevant to determining the amounts payable under this Agreement, and shall preserve all such information, records and documents (to the extent a part of the Purchased Assets delivered to the Buyer at the Closing) at least until the expiration of any applicable statute of limitations or extensions thereof.  The Sellers shall be responsible for filing any and all Tax Returns and Tax documentation relating to the Business or the Sellers' operations relating to periods prior to the Closing Date.

8.8    Tax Effects.  None of the Parties (nor such Parties' counsel or accountants) has made or is making any representations to any other Party (nor such Party's counsel or accountants) concerning any of the Tax effects of the Transaction provided for in this Agreement as each Party represents that each has obtained, or may obtain, independent Tax advice with respect thereto and upon which it, if so obtained, has solely relied.

8.9    Misdirected Payments.  The Parties covenant and agree to promptly remit to the other Party any payments received, which payments are on or in respect of accounts or notes receivable owned by (or are otherwise payable to) such other Party.

8.10    Survival of Representations, Warranties and Covenants.  The Buyer and the Sellers acknowledge and agree that all of the representations and warranties contained in Article VI and Article VII shall expire as of the Closing and be of no further force or effect on and after the

Closing.  All covenants and agreements of the Parties shall survive the Closing for the period explicitly specified herein.

8.11    As-Is Where-Is Sale; Sellers' Disclaimers.  IT IS EXPRESSLY UNDERSTOOD AND AGREED BY THE BUYER THAT, EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES OF THE SELLERS SET FORTH IN ARTICLE VI OF THIS AGREEMENT, THE PURCHASED ASSETS ARE BEING SOLD BY THE SELLERS AND PURCHASED BY THE BUYER IN THEIR THEN PRESENT CONDITION AT THE CLOSING "AS IS" AND "WHERE IS", "WITHOUT RECOURSE", AND WITH ALL FAULTS AND DEFECTS, LATENT OR OTHERWISE, AND THAT THE SELLERS ARE MAKING NO ADDITIONAL REPRESENTATIONS OR WARRANTIES TO THE BUYER OF ANY KIND, EITHER EXPRESS OR IMPLIED, BY OPERATION OF LAW OR OTHERWISE, INCLUDING AS TO (A) THE VALUE, NATURE, LOCATION QUALITY, OR CONDITION OF THE PURCHASED ASSETS; (B) THE INCOME TO BE DERIVED FROM THE BUSINESS OR THE PURCHASED ASSETS OR THE OPERATIONS OR RESULTS OF OPERATIONS OR ECONOMIC FORECASTS OR PROJECTIONS CONCERNING EARNINGS OR PROFITS; (C) THE SUITABILITY OF THE PURCHASED ASSETS FOR ANY AND ALL ACTIVITIES AND USES THAT THE BUYER MAY CONDUCT FOLLOWING THE CLOSING; (D) THE COMPLIANCE OF OR BY THE PURCHASED ASSETS OR THE BUSINESS WITH ANY LAWS, RULES, ORDINANCES, OR REGULATIONS OF ANY APPLICABLE GOVERNMENT ENTITY; (E) THE HABITABILITY, SUITABILITY, MERCHANTABILITY, MARKETABILITY, PROFITABILITY, OR FITNESS FOR A PARTICULAR PURPOSE OR ANY PURPOSE OF THE PURCHASED ASSETS; (F) THE MANNER OR QUALITY OF THE CONSTRUCTION OR MATERIALS, IF ANY, INCORPORATED INTO THE PURCHASED ASSETS; (G) THE PHYSICAL CONDITION OF THE PURCHASED ASSETS OR THE MANNER, QUALITY, STATE OF REPAIR, OR LACK OF REPAIR OF THE PURCHASED ASSETS; (H) COMPLIANCE WITH ANY ENVIRONMENTAL LAWS OR LAND USE LAWS, RULES, REGULATIONS, ORDERS, OR REQUIREMENTS, INCLUDING THE EXISTENCE OF HAZARDOUS MATERIALS; (I) THE ENFORCEABILITY OF ANY ASSUMED CONTRACT OR RIGHT OR PERMIT ASSIGNED HEREUNDER; OR (J) ANY OTHER MATTER WITH RESPECT TO THE PURCHASED ASSETS OR THE BUSINESS. THE BUYER ACKNOWLEDGES THAT, EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES OF THE SELLERS SET FORTH IN ARTICLE VI OF THIS AGREEMENT, IT IS FULLY RELYING ON THE BUYER'S (OR THE BUYER'S REPRESENTATIVES') INSPECTIONS OF THE PURCHASED ASSETS AND NOT UPON ANY STATEMENT (ORAL OR WRITTEN) WHICH MAY HAVE BEEN MADE OR MAY BE MADE (OR PURPORTEDLY MADE) BY THE SELLERS OR ANY OF THEIR REPRESENTATIVES. THE BUYER ACKNOWLEDGES THAT THE BUYER HAS (OR THE BUYER'S REPRESENTATIVES HAVE) THOROUGHLY INSPECTED AND EXAMINED THE PURCHASED ASSETS TO THE EXTENT DEEMED NECESSARY BY THE BUYER IN ORDER TO ENABLE THE BUYER TO EVALUATE THE CONDITION OF THE PURCHASED ASSETS, AND ALL OTHER ASPECTS OF THE PURCHASED ASSETS, AND THE BUYER ACKNOWLEDGES THAT, EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES OF THE SELLERS SET FORTH IN ARTICLE VI OF THIS AGREEMENT, THE BUYER IS RELYING SOLELY UPON ITS OWN (OR ITS REPRESENTATIVES') INSPECTION, EXAMINATION AND EVALUATION OF THE PURCHASED ASSETS AND THEIR CONDITION.  THE BUYER ACKNOWLEDGES THAT ANY CONDITION OF THE

PURCHASED ASSETS THAT THE BUYER DISCOVERS OR DESIRES TO CORRECT OR IMPROVE PRIOR TO OR AFTER THE CLOSING SHALL BE AT THE BUYER'S SOLE EXPENSE.

THE BUYER HEREBY ACKNOWLEDGES THAT THE SELLERS WOULD NOT AGREE TO SELL THE PURCHASED ASSETS ON THE TERMS AND CONDITIONS THAT ARE SET FORTH IN THIS AGREEMENT IF THE BUYER DID NOT AGREE TO EACH AND EVERY PROVISION IN THIS <u>SECTION 8.11</u>.

THE PROVISIONS OF THIS <u>SECTION 8.11</u> SHALL SURVIVE THE EXPIRATION OR THE TERMINATION OF THIS AGREEMENT OR THE CLOSING (AS APPLICABLE).

## ARTICLE IX.
## <u>CONDITIONS PRECEDENT</u>

9.1    <u>Conditions to the Obligations of the Buyer</u>.  The obligations of the Buyer to effect the Transaction are subject to the satisfaction at or prior to the Closing of the following conditions, unless waived in writing by the Buyer:

(a)    except for those representations and warranties which are made as of a particular date, the representations and warranties of the Sellers set forth in <u>Article VI</u> of this Agreement shall be true and correct in all material respects as of the Execution Date and as of the Closing Date as if made at and as of the Closing Date (except with respect to those representations and warranties which are qualified as to materiality, which shall be true and correct in all respects as of the Closing Date).  The representations and warranties of the Sellers set forth in <u>Article VI</u> of this Agreement which are made as of a particular date shall be true and correct in all material respects as of such specific date;

(b)    the Sellers shall have performed in all material respects all obligations required to be performed by them under this Agreement at or prior to the Closing;

(c)    the Sellers shall have executed, as applicable, and delivered to the Buyer all of the documents and other items required to be delivered by the Sellers at the Closing pursuant to <u>Section 5.2(a)</u> of this Agreement;

(d)    no Action shall be pending or threatened before any Government Entity that seeks to or does, and no Law shall be in effect that will, prevent consummation of the Transaction; and

(e)    the Court Approval shall have been obtained and be in full force and effect and each of the Sale Order and the Contracts Assignment Order shall have been entered by the Bankruptcy Court.

9.2    <u>Conditions to the Obligations of the Sellers</u>.  The obligations of the Sellers to effect the Transaction are subject to the satisfaction at or prior to the Closing of the following conditions, unless waived in writing by the Sellers:

(a)    except for those representations and warranties which are made as of a particular date, the representations and warranties of the Buyer set forth in <u>Article VII</u> of this Agreement shall be true and correct in all material respects as of the Execution Date and as of the Closing Date as if made at and as of the Closing Date (except with respect to those representations and warranties which are qualified as to materiality, which shall be true and correct in all respects as of the Closing Date). The representations and warranties of the Buyer set forth in <u>Article VII</u> of this Agreement which are made as of a particular date shall be true and correct in all material respects as of such specific date;

(b)    the Buyer shall have performed in all material respects all obligations required to be performed by it under this Agreement at or prior to the Closing;

(c)    the Buyer shall have executed, as applicable, and delivered to the Sellers all of the documents and other items required to be delivered by the Buyer at the Closing pursuant to <u>Section 5.2(b)</u> of this Agreement;

(d)    no Action shall be pending or threatened before any Government Entity that seeks to or does, and no Law shall be in effect that will, prevent consummation of the Transaction; and

(e)    the Court Approval shall have been obtained and be in full force and effect and each of the Sale Order and the Contracts Assignment Order shall have been entered by the Bankruptcy Court.

## ARTICLE X.
## <u>TERMINATION; BREAK-UP FEE</u>

10.1    <u>Events of Termination</u>. This Agreement may be terminated and the Transaction contemplated hereby may be abandoned at any time prior to the Closing:

(a)    by mutual written consent of the Parties;

(b)    by either Party, if the Closing Date shall not have occurred (or the conditions precedent to Closing set forth in <u>Article IX</u> of this Agreement have not been satisfied or waived) by September 30, 2025 (the "<u>Outside Closing Date</u>"); <u>provided</u>, <u>however</u>, that the right to terminate this Agreement under this <u>Section 10.1(b)</u> shall not be available to any Party whose failure to fulfill any obligation under this Agreement shall be the cause of the failure of the Closing Date to occur on or before the Outside Closing Date;

(c)    by the Sellers, if there has been a material breach of any covenant or condition or any representation or warranty of the Buyer and the Sellers have notified the Buyer of such breach in writing, and the breach has not been cured (if capable of being cured) within ten (10) days after delivery of such notice (and if not capable of being cured, immediately);

(d)    by the Buyer, if there has been a material breach of any covenant or condition or any representation or warranty of the Sellers and the Buyer has notified the Sellers of such breach in writing, and the breach has not been cured (if capable of being cured) within ten (10) days after delivery of such notice (and if not capable of being cured, immediately);

(e)    by any Party, if there shall be any Law of any Government Entity that makes consummation of the Transaction illegal or otherwise prohibited or if any judgment, injunction, order or decree of any Government Entity prohibiting the Transaction is entered and such judgment, injunction, order or decree shall have become final and non-appealable; or

(f)    by the Sellers, if any party other than the Buyer is selected as the Successful Bidder for the Purchased Assets.

10.2    <u>Effect of Termination</u>.    In the event that this Agreement shall be terminated pursuant to <u>Section 10.1</u>, all further obligations of the Parties under this Agreement shall terminate without further Liability of any Party to any other Party hereunder except as provided in <u>Section 10.3</u> and <u>Section 10.4</u> and those provisions that expressly survive the termination of this Agreement; <u>provided</u>, <u>however</u>, that no Party shall be released from Liability hereunder, subject to the express provisions of this Agreement, if this Agreement is terminated and the Transaction abandoned by reason of (i) the failure of such Party to have performed its obligations hereunder, or (ii) any knowing misrepresentation made by such Party of any matter set forth herein.

10.3    <u>Disbursement of Total Deposit</u>.    In the event of a termination of this Agreement pursuant to <u>Section 10.1(a)</u>, <u>Section 10.1(b)</u> (due to the fault of the Sellers), <u>Section 10.1(d)</u>, <u>Section 10.1(e)</u>, or <u>Section 10.1(f)</u>, the Total Deposit shall be disbursed by the Escrow Agent to the Buyer. In the event of a termination of this Agreement pursuant to <u>Section 10.1(b)</u> (due to the fault of the Buyer) or <u>Section 10.1(c)</u>, the Total Deposit shall be disbursed by the Escrow Agent to the Sellers.

10.4    <u>Break-Up Fee</u>.    In the event of a termination of this Agreement pursuant to <u>Section 10.1(f)</u>, the Sellers shall pay to the Buyer a termination fee in the amount of One Hundred Ten Thousand and 00/100 Dollars ($110,000.00) (the "<u>Break-Up Fee</u>"). The Break-Up Fee shall only be due and payable to the Buyer in the event that (i) the Buyer is not the Successful Bidder for the Purchased Assets, and (ii) the Purchased Assets are actually sold to a party other than the Buyer (an "<u>Alternative Transaction</u>"). The Break-Up Fee, if earned, shall be (a) allowed as an administrative expense claim in the Bankruptcy Case pursuant to Sections 503(b) and 507(a)(2) of the Bankruptcy Code, (b) payable to the Buyer only upon the closing of the Alternative Transaction, and (c) paid only out of the proceeds of the sale of the Purchased Assets in an Alternative Transaction. The Parties acknowledge and agree that the Break-Up Fee is not a penalty, but represents liquidated damages in a reasonable amount that will compensate the Buyer for the opportunity costs, time, resources, and capital committed in connection with this Agreement, which damages would be difficult to calculate with precision. Notwithstanding anything to the contrary in this Agreement, payment of the Break-Up Fee shall constitute the Buyer's sole and exclusive remedy for termination under <u>Section 10.1(f)</u> and, upon payment of the Break-Up Fee as provided herein, the Buyer shall have no further claims against the Sellers arising from or relating to the termination of this Agreement under <u>Section 10.1(f)</u>. The Buyer acknowledges and agrees that, except as provided in this <u>Section 10.4</u>, the Buyer shall have no claim for any damages, monetary or otherwise, due to the termination of this Agreement.

## ARTICLE XI.
## MISCELLANEOUS

11.1    Further Assurances.  Each of the Parties hereby covenants that, from time to time after the Closing Date, at the other Party's request and without further consideration, it will do, execute, acknowledge and deliver, or cause to be done, executed, acknowledged and delivered, all such further acts, conveyances, transfers, assignments, powers of attorney and assurances as reasonably may be required more effectively to convey, transfer to and vest in the Buyer, and to put the Buyer in possession of, any of the Purchased Assets transferred or assigned hereunder and otherwise to carry out the purposes of this Agreement; provided, however, that, except as expressly set forth in this Agreement or any other Transaction Document, no Party shall be required to make any monetary expenditures, commence or participate in any Action before any Government Entity, or offer or grant any material accommodation (financial or otherwise) to any Person in connection with the obligations described in this Section 11.1.

11.2    Legal Fees and Costs.

(a)    Except as otherwise provided in this Agreement, each Party shall bear and be responsible for any and all fees, costs and expenses incurred by such Party (including all fees and expenses of its Representatives) in connection with the negotiation and consummation of the transactions contemplated by this Agreement, including any and all agreements entered into before and contemporaneous with this Agreement.

(b)    In the event a Party elects to incur legal expenses to enforce or interpret any provision of this Agreement by judicial proceedings, the prevailing Party will be entitled to recover such legal expenses, including reasonable attorneys' fees, costs, and necessary disbursements at all court levels, in addition to any other relief to which such Party shall be entitled to hereunder.

11.3    Governing Law.  The Parties agree that this Agreement shall be governed by and construed in accordance with the Laws of the State of Minnesota without regard to conflict of Laws principles.

11.4    Binding Effect; Assignment.  This Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns.  No Party may assign this Agreement without the prior written consent of the other Party, except that the Buyer may assign all of its rights and obligations under this Agreement to an Affiliate of the Buyer.

11.5    Waiver of Breach.  The waiver by any Party of a breach or violation of any provision of this Agreement shall not operate as, or be construed to constitute, a waiver of any subsequent breach of the same or any other provision hereof.  This Agreement may only be amended, or rights hereunder waived, by agreement in writing by the Party to be charged.

11.6    Notice.  Any notice, request, demand, waiver, consent, approval, or other communication (collectively, a "Communication") that is required or permitted to be given to any Party under this Agreement will be valid only if it is in writing (whether or not this Agreement expressly provides for it to be in writing) and given to that Party by electronic mail transmission, hand delivery, overnight mail, or first-class, postage prepaid, United States mail at the mailing

address or electronic mail address set forth below or to any other mailing address or electronic mail address as a Party designates by written notice given in the manner provided in this <u>Section 11.6</u>:

    (a)    If to the Sellers:

    iCoreConnect Inc.
iCore Midco Inc.
10524 Moss Park Rd, Ste 204-325
Orlando, Florida 32832
Attention: Archit Shah, Chief Financial Officer
Email: ashah@icoreconnect.com

    With a copy to:

    Stichter, Riedel, Blain & Postler, P.A.
110 East Madison Street, Suite 200
Tampa, Florida 33602
Attention: Charles A. Postler, Esq.
Email: cpostler@srbp.com

    (b)    If to the Buyer:

    Colortech Holdings, LLC
PO Box 9495
Fargo, North Dakota 58106-9495
Attention: Sanjay C. Patel, Managing Member
Email: sanjay@nethertz.com

    With a copy to:

    Quantum Lex PA
6800 France Avenue South, Suite 405
Minneapolis, Minnesota 55435
Attention: John R. Neve, Esq.
Email: jneve@quantumlex.io

A Communication under this Agreement will be effective and deemed to have been given (i) one (1) Business Day after being sent by hand delivery, electronic mail transmission, or overnight mail, with confirmation of receipt, or (ii) five (5) Business Days following the date mailed when mailed by first-class, postage prepaid, United States mail. Each Party promptly shall notify the other Party of any change in its mailing address or electronic mail address for Communications. The delivery to a Party's legal counsel of a copy of a Communication will not constitute delivery of the Communication to the Party, unless so confirmed in writing by the Party's counsel.

11.7    <u>Severability</u>.  In the event any provision of this Agreement is held to be invalid, illegal or unenforceable for any reason and in any respect, such invalidity, illegality, or unenforceability shall in no event affect, prejudice, or disturb the validity of the remainder of this Agreement, which shall be and remain in full force and effect, enforceable in accordance with its terms.

11.8    <u>Gender and Number</u>.  Whenever the context of this Agreement requires, the gender of all words herein shall include the masculine, feminine, and neuter, and the number of all words herein shall include the singular and plural.

11.9    <u>Divisions and Headings</u>.  The divisions of this Agreement into articles, sections and subsections and the use of captions and headings in connection therewith are solely for convenience and shall have no legal effect in construing the provisions of this Agreement.

11.10    <u>Third-Party Beneficiaries</u>.    Except as otherwise expressly provided in this Agreement, the terms and provisions of this Agreement are intended solely for the benefit of the Parties and their respective permitted successors or assigns, and it is not the intention of the Parties to confer, and this Agreement shall not confer, third-party beneficiary rights upon any other Person.

11.11    <u>Entire Agreement; Amendment</u>.  This Agreement (together with all Schedules and Exhibits attached hereto and certificates and documents to be delivered in connection herewith) supersedes all previous contracts or understandings, including any offers, letters of intent, proposals or letters of understanding (including the Letter of Intent), and constitutes the entire agreement of whatsoever kind or nature existing between or among the Parties respecting the within subject matter, and no Party shall be entitled to benefits other than those specified herein.  As between or among the Parties, no oral statements or prior written material not specifically incorporated herein shall be of any force and effect.  The Parties specifically acknowledge that in entering into and executing this Agreement, the Parties rely solely upon the representations and agreements contained in this Agreement and any certificates and other documents being executed and delivered in connection herewith.  No changes in or amendments or additions to this Agreement shall be recognized unless and until made in writing and signed by all Parties hereto.  The Schedules and Exhibits hereto constitute an integral and material part of this Agreement, are incorporated herein by reference, and shall be considered part of this Agreement for all purposes.

11.12    <u>WAIVER OF JURY TRIAL</u>.  EACH PARTY HEREBY UNCONDITIONALLY WAIVES ITS RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS AGREEMENT, ANY OF THE TRANSACTION DOCUMENTS RELATED HERETO, ANY DEALINGS BETWEEN THE PARTIES RELATING TO THE SUBJECT MATTER OF THIS AGREEMENT OR ANY RELATED TRANSACTION.

11.13    <u>SUBMISSION TO JURISDICTION</u>.  EACH PARTY IRREVOCABLY AND UNCONDITIONALLY SUBMITS TO THE EXCLUSIVE JURISDICTION OF THE BANKRUPTCY COURT AND ANY APPELLATE COURT ARISING THEREFROM, IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT, THE TRANSACTION OR ANY OF THE TRANSACTION DOCUMENTS ENTERED INTO IN CONNECTION HEREWITH OR FOR THE RECOGNITION OR ENFORCEMENT OF ANY

JUDGMENT, AND EACH OF THE PARTIES HERETO IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ALL CLAIMS IN RESPECT OF ANY SUCH ACTION OR PROCEEDING SHALL BE HEARD AND DETERMINED IN SUCH COURTS. EACH OF THE PARTIES AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND BINDING ON SUCH PARTY.

    11.14    <u>Execution in Counterparts</u>. A Party may deliver executed signature pages to this Agreement by facsimile transmission or by electronic mail transmission to the other Party, and may bear signatures affixed electronically (i.e. DocuSign or any electronic signature platform complying with the U.S. federal SIGN Act of 2000), which facsimile copy or electronic copy shall be deemed to be an original executed signature page. This Agreement may be executed in any number of counterparts, each of which shall be deemed an original and all of which counterparts together shall constitute one agreement with the same effect as if the Parties had signed the same signature page.

    11.15    <u>No Strict Construction</u>. The Parties have participated jointly in the negotiation and drafting of this Agreement and the Transaction Documents. Accordingly, in the event an ambiguity or question of intent or interpretation arises, this Agreement and the Transaction Documents shall be construed as if drafted jointly by the Parties, and no presumption or burden of proof shall arise favoring or disfavoring either Party by virtue of the authorship of any provisions of this Agreement and the Transaction Documents.

    11.16    <u>Recitals</u>. The Parties agree that the Recitals set forth above are incorporated in and made a part of this Agreement as if fully set forth herein.

*[Signatures on Following Pages]*

IN WITNESS WHEREOF, this Agreement has been executed and delivered as of the date and year first above written by a duly authorized officer or representative of each Party hereto, as the case may be.

**SELLERS:**

**iCoreConnect Inc.**

By: _____

Name:  Archit Shah

Title:   Chief Financial Officer

**iCore Midco Inc.**

By: _____

Name:  Archit Shah

Title:  Treasurer

*[Signature Page to Asset Purchase Agreement]*

**BUYER:**

**Colortech Holdings, LLC**

By: _____

Name:  Sanjay C. Patel

Title:   Managing Member

*[Signature Page to Asset Purchase Agreement]*

## ACKNOWLEDGMENT BY ESCROW AGENT

The undersigned Escrow Agent hereby accepts its designation as the escrow agent with respect to the Total Deposit referred to in the foregoing Asset Purchase Agreement, and agrees to hold and disburse the Total Deposit as provided therein.

Date: August 1, 2025

**Stichter, Riedel, Blain & Postler, P.A.**

By: _____
Name: Charles A. Postler
Its: Partner

## **Index to Exhibits**

Exhibit A    –    Form of Bill of Sale
Exhibit B    –    Form of Assignment Agreement
Exhibit C    –    Form of Assumption Agreement
Exhibit D    –    Form of Intellectual Property Assignment

## **Exhibit A**

Form of Bill of Sale


(See Attached Document)

## **Exhibit B**

Form of Assignment Agreement


(See Attached Document)

**<u>Exhibit C</u>**

Form of Assumption Agreement

(See Attached Document)

## **Exhibit D**

Form of Intellectual Property Assignment

(See Attached Document)

## **<u>Index to Schedules</u>**

<u>Schedule 2.2(p)</u>  –  Excluded Assets
<u>Schedule 6.7</u>  –  Intellectual Property
<u>Schedule 6.9</u>  –  Litigation
<u>Schedule 6.11</u>  –  Insurance

## **Schedule 2.2(p)**

Excluded Assets

Docusign Envelope ID: B650799E-21EF-4943-82FD-8800C2799155

## **Schedule 6.7**

Intellectual Property

**<u>Schedule 6.9</u>**

Litigation

## **<u>Schedule 6.11</u>**

Insurance

(See Attached Document)

# EXHIBIT A

## Bill of Sale

## QUITCLAIM BILL OF SALE

KNOW ALL MEN BY THESE PRESENTS that **iCoreConnect Inc.**, a Delaware corporation ("iCore"), and **iCore Midco Inc.**, a Nevada corporation ("Midco" and together with iCore, collectively, the "Sellers"), for and in consideration of the sum of Ten Dollars ($10.00) and other good and valuable consideration to them in hand paid, the receipt and sufficiency of which are hereby acknowledged, do hereby assign, grant, bargain, sell, transfer, convey, and deliver to **Colortech Holdings, LLC**, a North Dakota limited liability company (the "Buyer"), all of the Sellers' right, title and interest in and to the assets of the Sellers described on Exhibit A attached hereto and incorporated herein by this reference thereto (collectively, the "Purchased Assets").

TO HAVE AND TO HOLD THE SAME unto the Buyer and its successors and assigns forever.

Other than as expressly set forth in the Asset Purchase Agreement (as defined below), the Purchased Assets are sold by the Sellers "AS IS", "WHERE IS", AND "WITH ALL FAULTS" AND WITHOUT RECOURSE AND THE SELLERS MAKE NO REPRESENTATION OR WARRANTY, WHETHER EXPRESS OR IMPLIED, TO THE BUYER AS TO THE QUALITY, CHARACTER, OR CONDITION OF THE PURCHASED ASSETS OR AS TO THEIR MERCHANTABILITY OR FITNESS FOR ANY PURPOSE.

This Quitclaim Bill of Sale is executed and the Purchased Assets are assigned, granted, bargained, sold, transferred, conveyed, and delivered to the Buyer pursuant to and in accordance with that certain Asset Purchase Agreement, dated as of July 25, 2025, by and between the Sellers and the Buyer (the "Asset Purchase Agreement").

Notwithstanding anything to the contrary contained herein, the Purchased Assets shall not include any of the assets of the Sellers described on Exhibit B attached hereto and incorporated herein by this reference thereto (collectively, the "Excluded Assets").

Capitalized terms and references to Sections and Schedules used in this Quitclaim Bill of Sale and in Exhibit A and Exhibit B attached hereto and not otherwise defined herein or therein shall have the meaning ascribed thereto in the Asset Purchase Agreement. This Quitclaim Bill of Sale is executed and delivered in accordance with and is subject to all of the terms and conditions of the Asset Purchase Agreement. Nothing contained in this Quitclaim Bill of Sale shall be deemed to supersede, enlarge on, or modify any of the obligations, agreements, covenants, or warranties of the Sellers contained in the Asset Purchase Agreement.

[SIGNATURE PAGE TO FOLLOW]

IN WITNESS WHEREOF, each of the Sellers has caused this Quitclaim Bill of Sale to be executed and delivered effective as of the ____ day of _____, 2025.

**SELLERS:**

**iCoreConnect Inc.**

By: _____
Name: Archit Shah
Title:   Chief Financial Officer

**iCore Midco Inc.**

By: _____
Name: Archit Shah
Title:   Treasurer

**Exhibit A**

**PURCHASED ASSETS**

All of the Sellers' right, title and interest in, to and under all assets of every kind, nature and description, whether real, personal or mixed, tangible or intangible, wherever located, owned or held by the Sellers and used in or otherwise relating to the Business as set forth below:

(a) the Accounts Receivable;

(b) all future cash flow and cash earnings;

(c) all Intellectual Property, including as set forth on Schedule 6.7 attached to the Asset Purchase Agreement;

(d) all items of intangible property, including the SaaS technology platform, all of its modules, and associated infrastructure that allows full working deployment of Sellers' products;

(e) all items of tangible personal property consisting of all furniture, fixtures, improvements, furnishings, equipment, machinery, appliances, and other personal property of every kind used in the operation of the Business;

(f) all inventory (including raw materials, work-in-process, finished goods and supplies);

(g) the Assumed Contracts;

(h) all books and records which relate to the Business or the Purchased Assets, but expressly excluding all documents and other materials which (i) are legally privileged or constitute attorney-client work product, or (ii) are subject to any Law or a confidentiality agreement prohibiting their disclosure;

(i) to the extent transferable under applicable Law (including the Bankruptcy Code), permits, authorizations, approvals, decisions, zoning orders, registrations, licenses, filings, certificates, variances or similar rights issued to the Sellers and used by or in connection with the Business;

(j) all information regarding the Sellers' past, current and prospective customers and suppliers (including any and all lists thereof (including contact information), purchase and sale history, correspondence, complaints, and any and all other data, reports, and information of any kind kept or maintained by or on behalf of the Sellers), pricing and cost information, and business and marketing plans and proposals;

(k) except as provided in Section 2.2(a) and Section 2.2(i) of the Asset Purchase Agreement, all prepayments and prepaid expenses relating to the Business or the Purchased Assets;

(l) all telephone and facsimile numbers and telephone directory listings, and all websites and domains;

(m) rights, to the extent assignable, under any agreements in favor of the Sellers or for the benefit of the Sellers with current or former employees, contractors or third parties, with respect to non-competition, non-solicitation, or other restrictive covenants, regardless of whether any such Person accepts an offer of employment from the Buyer or continues to perform services for the Buyer;

(n) books, records, ledgers, files, documents, correspondence, lists, plans, drawings and specifications, creative materials, sales collateral, advertising and promotional materials, studies, reports, and other printed or written materials, including records related to inventory and maintenance of the Purchased Assets, whether in written or electronic form, other than employment records that may not be transferred pursuant to applicable Law;

(o) personnel records for Employees who are Transferred Employees;

(p) all goodwill associated with the Business; and

(q) all other assets that are necessary to the continued operation of the Business.

**Exhibit B**

**EXCLUDED ASSETS**

Notwithstanding anything to the contrary contained in the Asset Purchase Agreement, the Purchased Assets shall not include the following assets of the Sellers, which shall be retained by the Sellers:

(a)     restricted and unrestricted cash and cash equivalents (including all restricted cash held by or for the benefit of the Sellers), cash accounts (including cash accounts serving as collateral for secured debt, letters of credit, insurance policies or programs), marketable securities and certificates of deposit, deposits and other prepaid amounts made or held on the account of the Sellers with respect to any Contracts (including the Assumed Contracts), utility deposits, temporary investments of cash, and all bank accounts and all electronic fund transfer accounts;

(b)     all amounts due to the Sellers from any other Person who is an Affiliate of the Sellers, including any intercompany accounts;

(c)     all amounts due to the Sellers from any Employee for advances or loans made by the Sellers to such Employee;

(d)     any Contract that is not an Assumed Contract;

(e)     all inventory of the Sellers that is disposed of or exhausted prior to the Closing Date in the Ordinary Course;

(f)     the Sellers' corporate minute books, Governance Documents and tax records, and any other records which the Sellers are required to retain by Law (provided, however, that the Buyer shall be entitled to receive, at its expense, copies of such portions thereof as the Buyer may reasonably request which are related to the Business);

(g)     personnel records for Employees who are not Transferred Employees;

(h)     any and all of the Sellers' or the Estates' actions, claims, demands, rights, defenses, counterclaims, proceedings, suits and causes of action of any value whatsoever, whether known or unknown, in law, equity or otherwise, against any creditor or other third party and the proceeds or benefits thereof, including any and all actions which a trustee, debtor in possession or other appropriate party in interest may assert on behalf of the Debtors or the Estates under Chapter 5 of the Bankruptcy Code, including actions under one or more provisions of Sections 542, 543, 544, 545, 546, 547, 548, 549, 550, 551, and 553 of the Bankruptcy Code or under any other similar applicable federal, state or common law, and the Sellers' claims or causes of action for professional negligence and director and officer liability, but excluding (i) any claim expressly released in writing by the Sellers, and (ii) any claim against the Buyer or any Affiliate of the Buyer other than as expressly provided for in the Asset Purchase Agreement;

(i)     any insurance policies and all insurance proceeds and return of insurance premiums arising in connection with the ownership or operation of the Purchased Assets or the Business prior to the Closing;

(j)      all claims, rights, interests and proceeds with respect to refunds of Taxes for periods ending prior to the Closing Date and all rights to pursue appeals of the same;

(k)      any personal property of any Employees of the Sellers;

(l)      any Employee Benefit Plan;

(m)      the consideration delivered by the Buyer to the Sellers pursuant to the Asset Purchase Agreement;

(n)      any and all rights of the Sellers under the Asset Purchase Agreement and the Transaction Documents;

(o)      the proceeds, benefits and other recoveries on account of the foregoing items in subparagraphs (a) through (n); and

(p)      the assets and properties of the Sellers set forth on <u>Schedule 2.2(p)</u> attached to the Asset Purchase Agreement.

(j)      all claims, rights, interests and proceeds with respect to refunds of Taxes for periods ending prior to the Closing Date and all rights to pursue appeals of the same;

(k)      any personal property of any Employees of the Sellers;

(l)      any Employee Benefit Plan;

(m)      the consideration delivered by the Buyer to the Sellers pursuant to the Asset Purchase Agreement;

(n)      any and all rights of the Sellers under the Asset Purchase Agreement and the Transaction Documents;

(o)      the proceeds, benefits and other recoveries on account of the foregoing items in subparagraphs (a) through (n); and

(p)      the assets and properties of the Sellers set forth on Schedule 2.2(p) attached to the Asset Purchase Agreement.

## EXHIBIT B

**Assignment Agreement**

## ASSIGNMENT AND ASSUMPTION AGREEMENT

THIS ASSIGNMENT AND ASSUMPTION AGREEMENT (this "Assignment") is made and entered into this ____ day of _____, 2025, by and between (i) **iCoreConnect Inc.**, a Delaware corporation ("iCore"), and **iCore Midco Inc.**, a Nevada corporation ("Midco" and together with iCore, collectively, the "Assignor"), on the one hand, and (ii) **Colortech Holdings, LLC**, a North Dakota limited liability company ("Assignee"), on the other hand.

**W I T N E S S E T H :**

WHEREAS, Assignor and Assignee are parties to that certain Asset Purchase Agreement, dated as of July 25, 2025 (the "Purchase Agreement"), pursuant to which Assignor has agreed to grant, sell, assign, transfer and deliver to Assignee all right, title and interest of Assignor in, to and under the Purchased Assets, free and clear of any and all Liens, other than the Permitted Liens and the Assumed Liabilities;

WHEREAS, pursuant to Section 2.1(g) of the Purchase Agreement, the Purchased Assets include all of Assignor's right, title, and interest in, to and under certain Contracts to which Assignor is a party, a list of which is attached hereto as Exhibit A (such Contracts shall hereinafter be referred to, collectively, as the "Assumed Contracts");

WHEREAS, Assignor and Assignee desire to provide for the assignment of the Assumed Contracts to Assignee at and effective as of the Closing; and

WHEREAS, pursuant to Section 2.3 of the Purchase Agreement, Assignor has agreed to assume the future payment and performance of the Assumed Liabilities with respect to the Assumed Contracts at and effective as of the Closing.

NOW, THEREFORE, in consideration of the premises and for other valuable consideration, the receipt, adequacy and sufficiency of which are hereby acknowledged by the parties hereto, the parties hereto hereby agree as follows:

1.      **Assignment**.  Assignor does hereby bargain, sell, transfer, convey, assign and deliver to Assignee, its successors and assigns, all right, title, and interest of Assignor in, to and under the Assumed Contracts, in each case from and after the Closing.

TO HAVE AND TO HOLD the same unto Assignee, its successors and assigns, for their own exclusive use and benefit forever.

2.      **Acceptance and Assumption**.  Assignee does hereby accept, and acknowledges the receipt of, the assignment by Assignor of all right, title, and interest of Assignor in, to and under the Assumed Contracts, in each case from and after the Closing.  Assignee agrees to assume all Liabilities under, arising from or relating to the Assumed Contracts with respect to matters occurring thereunder on or after the Closing Date.

3.      **Effective Time**.  This Assignment shall be deemed to be effective immediately upon the Closing of the Transaction contemplated by the Purchase Agreement.

4.      **Further Assurances**.  From time to time after the Closing Date, each party hereto shall, upon the reasonable request of the other, execute and deliver or cause to be executed and delivered such further instruments of conveyance, assignment, delegation, transfer and assumption, and take such further action, as may reasonably be requested in order to more effectively carry out the purposes and intent of this Assignment.

5.      **Purchase Agreement**.  Capitalized terms used in this Assignment and not otherwise defined herein shall have the meaning ascribed thereto in the Purchase Agreement.    This Assignment is subject in all respects to the terms and conditions of the Purchase Agreement.  Nothing contained in this Assignment shall be deemed to modify, replace, amend, change, rescind, waive or in any way affect the express provisions (including the warranties, covenants, agreements, conditions, representations or any of the obligations, and the limitations relating thereto, of Assignee or Assignor) set forth in the Purchase Agreement, this Assignment being intended solely to effect the transfer of certain assets, obligations and liabilities pursuant to the Purchase Agreement.  To the extent any provision of this Assignment is inconsistent with the Purchase Agreement, the provisions of the Purchase Agreement shall govern and control.

6.      **Miscellaneous**.  This Assignment may not be amended or modified except by an instrument in writing signed by, or on behalf of, Assignor and Assignee.  This Assignment may be executed in any number of counterparts, and any party hereto may execute any such counterpart, each of which when executed and delivered shall be deemed to be an original and all of which counterparts taken together shall constitute but one and the same instrument.  The parties agree that the delivery of this Assignment may be effected by means of an exchange of facsimile or electronically transferred signatures.

**[SIGNATURE PAGES FOLLOW]**

IN WITNESS WHEREOF, Assignor and Assignee have caused this Assignment to be executed as of the day and year first above written.

**<u>ASSIGNOR:</u>**

**iCoreConnect Inc.**

By: _____
Name: Archit Shah
Title:  Chief Financial Officer

**iCore Midco Inc.**

By: _____
Name: Archit Shah
Title:  Treasurer

**<u>ASSIGNEE:</u>**


**Colortech Holdings, LLC**


By:    _____
Name:  Sanjay C. Patel
Title:   Managing Member

**<u>Exhibit A</u>**

**Assumed Contracts**

[To Be Determined]

# **EXHIBIT C**

**Assumption Agreement**

## ASSUMPTION AGREEMENT

THIS ASSUMPTION AGREEMENT (this "Assumption Agreement") is made and entered into this _____ day of _____, 2025, by and between (i) **iCoreConnect Inc.**, a Delaware corporation ("iCore"), and **iCore Midco Inc.**, a Nevada corporation ("Midco" and together with iCore, collectively, the "Sellers"), on the one hand, and (ii) **Colortech Holdings, LLC**, a North Dakota limited liability company (the "Buyer"), on the other hand.

### W I T N E S S E T H:

WHEREAS, Sellers and Buyer are parties to that certain Asset Purchase Agreement dated as of July 25, 2025 (the "Purchase Agreement"), pursuant to which Sellers have agreed to sell to Buyer, and Buyer has agreed to purchase from Sellers, the Purchased Assets;

WHEREAS, in partial consideration for the sale of the Purchased Assets, Buyer has agreed, pursuant to Section 2.3 of the Purchase Agreement, to assume the future payment and performance of certain Liabilities of Sellers as hereinafter specified; and

WHEREAS, Sellers and Buyer desire to provide for the assumption by Buyer of the future payment and performance of certain Liabilities of Sellers as hereinafter specified, in accordance with the terms and conditions contained herein.

NOW, THEREFORE, in consideration of the premises and for other valuable consideration, the receipt, adequacy and sufficiency of which are hereby acknowledged by the parties hereto, the parties hereto hereby agree as follows:

1. **Assumption**. Buyer does hereby assume the future payment and performance of (or, if otherwise stated in the Purchase Agreement, shall pay at the Closing) the following Liabilities (collectively, the "Assumed Liabilities"):

    (a) all Liabilities relating to or first arising as a result of the operation of the Business or the ownership of the Purchased Assets on and after the Closing Date, as provided in the Purchase Agreement or the Transaction Documents;

    (b) all Liabilities under, arising from or relating to the Assumed Contracts with respect to (i) matters occurring thereunder on or after the Closing Date, and (ii) the Cure Amounts; and

    (c) all Liabilities agreed to be paid by Buyer pursuant to Section 3.6 of the Purchase Agreement.

2. **Excluded Liabilities**. Notwithstanding anything to the contrary contained in this Assumption Agreement, except for the Assumed Liabilities and payment of the Purchase Price, Buyer shall not assume, agree to pay, discharge or satisfy, or otherwise have any responsibility, liability or obligation for any Liability of Sellers or any Affiliate of Sellers.

3.       **Effective Time**.   This Assumption Agreement shall be deemed to be effective immediately upon the Closing of the transactions contemplated by the Purchase Agreement.

4.       **No Waiver**.   None of the terms or provisions of this Assumption Agreement may be waived, altered, modified or amended except by an instrument in writing duly executed by Sellers and Buyer.

5.       **Binding Nature**.   This Assumption Agreement and all obligations of Buyer hereunder shall be binding upon and inure to the benefit of the successors and permitted assigns of Buyer, and shall inure to the benefit of Sellers and their respective successors and assigns.

6.       **Execution in Counterparts**.   This Assumption Agreement may be executed in counterparts, all of which taken together shall be deemed and considered one and the same agreement, and same shall become effective when counterparts have been signed by each party hereto and each party has delivered its signed counterpart to the other party.   In the event that any signature is delivered by facsimile transmission or by e-mail delivery of a ".pdf" format file or other similar format file, such signature shall be deemed an original for all purposes and shall create a valid and binding obligation of the party executing same with the same force and effect as if such facsimile or ".pdf" signature page was an original thereof.

7.       **Capitalized Terms**.   Capitalized terms used herein and not otherwise defined herein shall have the meaning ascribed thereto in the Purchase Agreement.

[SIGNATURE PAGES FOLLOW]

IN WITNESS WHEREOF, Sellers and Buyer have caused this Assumption Agreement to be executed as of the day and year first above written.

**<u>SELLERS:</u>**


**iCoreConnect Inc.**


By: _____
Name:  Archit Shah
Title:   Chief Financial Officer


**iCore Midco Inc.**


By: _____
Name:  Archit Shah
Title:   Treasurer

**BUYER:**

**Colortech Holdings, LLC**

By: _____
Name:  Sanjay C. Patel
Title:   Managing Member

## <u>EXHIBIT D</u>

**Intellectual Property Assignment**

## ASSIGNMENT OF INTELLECTUAL PROPERTY

THIS ASSIGNMENT OF INTELLECTUAL PROPERTY (this "Assignment") is made and entered into this _____ day of _____, 2025, by and between (i) **iCoreConnect Inc.**, a Delaware corporation ("iCore"), and **iCore Midco Inc.**, a Nevada corporation ("Midco" and together with iCore, collectively, "Assignor"), on the one hand, and (ii) **Colortech Holdings, LLC**, a North Dakota limited liability company ("Assignee"), on the other hand.

### W I T N E S S E T H :

WHEREAS, Assignor and Assignee are parties to that certain Asset Purchase Agreement dated as of July 25, 2025 (the "Purchase Agreement"), pursuant to which Assignor has agreed to sell to Assignee, and Assignee has agreed to purchase from Assignor, the Purchased Assets;

WHEREAS, pursuant to Section 2.1(c) of the Purchase Agreement, the Purchased Assets include all of Assignor's right, title, and interest in, to and under the Intellectual Property, including as listed on Schedule 6.7 to the Purchase Agreement, and as more specifically described on Exhibit A attached hereto (hereinafter referred to, collectively, as the "Intellectual Property"); and

WHEREAS, Assignor and Assignee desire to provide for the assignment of the Intellectual Property to Assignee in accordance with the terms and conditions contained herein for recording with Government Entities including, but not limited to, the U.S. Patent and Trademark Office and the U.S. Copyright Office.

NOW, THEREFORE, in consideration of the execution of the Purchase Agreement, the payment of the consideration stipulated in the Purchase Agreement and for other valuable consideration, the receipt, adequacy and sufficiency of which are hereby acknowledged by the parties hereto, the parties hereto hereby agree as follows:

1.    **Assignment**.  Assignor does hereby irrevocably bargain, sell, transfer, convey, assign and deliver to Assignee, its successors and assigns, all right, title, and interest of Assignor in and to the Intellectual Property, together with the goodwill of the Business associated therewith and which is symbolized thereby, all rights to sue for infringement of any of the Intellectual Property, whether arising prior to or subsequent to the date of this Assignment, and any and all renewals and extensions thereof that may hereafter be secured under the Laws now or hereafter in effect in the United States and in any other jurisdiction, in each case from and after the Closing.

TO HAVE AND TO HOLD the same unto Assignee, its successors and assigns, for their own exclusive use and benefit forever.

2.    **Acceptance and Assumption**.  Assignee does hereby accept, and acknowledge the receipt of, the assignment by Assignor of all right, title, and interest of Assignor in and to the Intellectual Property, together with the goodwill of the Business associated therewith and which is symbolized thereby, all rights to sue for infringement of any of the Intellectual Property, whether arising prior to or subsequent to the date of this Assignment, and any and all renewals and extensions thereof that may hereafter be secured under the Laws now or hereafter in effect in the United States

and in any other jurisdiction, in each case from and after the Closing.

3. **Domain Names**.  Assignor does hereby instruct, authorize, and direct any and all registrars thereof to transfer any and all domain names to an account as directed by Assignee. Assignor agrees to cooperate with Assignee and to follow Assignee's reasonable instructions in order to effectuate the transfer of all domain name registrations in a timely manner, and Assignor or Assignee is hereby expressly permitted and authorized to provide a copy of this Assignment to any such registrar as necessary to accomplish such transfer.  Assignor further agrees that, within five (5) Business Days after the parties execute this Assignment, Assignor shall commence transfer of ownership of the domain names to Assignee in accordance with the on-line procedures provided by the registrar of the domain names.  Assignee shall cooperate with Assignor and provide information as necessary to Assignor to complete the ownership transfer.   Assignor shall provide written acknowledgement confirming completion of the transfer of ownership to Assignee of such domain names within ten (10) days of the date of this Assignment.

4. **Effective Time**.  This Assignment shall be deemed to be effective immediately upon the Closing of the Transaction contemplated by the Purchase Agreement.

5. **Recordation and Further Actions**. Assignor hereby authorizes the Commissioner for Patents, the Commissioner for Trademarks and the Register of Copyrights and any other governmental officials of any state or country or countries foreign to the United States, to record and register this Assignment upon request by Assignee, it successors, assigns and legal representatives, or to such nominees as it may designate.  Assignor shall take such steps and actions following the date hereof, including the execution of any documents, files, registrations, or other similar items, to ensure that the Intellectual Property is properly assigned to Assignee, or any assignee or successor thereto.

6. **Governing Law; Submission to Jurisdiction**.  Except to the extent that federal law preempts state law with respect to the matters covered hereby, this Assignment shall be governed by and construed in accordance with the laws of the State of Florida without giving effect to the principles of conflicts of laws thereof. Any legal suit, action or proceeding arising out of or based upon this Assignment or the transactions contemplated hereby may be instituted in the federal courts of the United States of America or the courts of the State of Florida in each case located in the county of Orange, and each party irrevocably submits to the exclusive jurisdiction of such courts in any such suit, action or proceeding.  In the event there is any legal suit, action or proceeding arising out of or based upon this Assignment or the transactions contemplated hereby, then the prevailing party in such legal suit, action or proceeding (including any appellate proceeding) shall be entitled to recover its costs and reasonable attorney fees from the non-prevailing party.

7. **Execution in Counterparts**.  This Assignment may be executed in counterparts, all of which taken together shall be deemed and considered one and the same agreement, and same shall become effective when counterparts have been signed by each party hereto and each party has delivered its signed counterpart to the other party.  In the event that any signature is delivered by facsimile transmission or by e-mail delivery of a ".pdf" format file or other similar format file, such signature shall be deemed an original for all purposes and shall create a valid and binding obligation of the party executing same with the same force and effect as if such facsimile or ".pdf"

signature page was an original thereof.

8.    **Purchase Agreement**.  Capitalized terms used in this Assignment and not otherwise defined herein shall have the meaning ascribed thereto in the Purchase Agreement.  This Assignment is subject in all respects to the terms and conditions of the Purchase Agreement.  Nothing contained in this Assignment shall be deemed to modify, replace, amend, change, rescind, waive or in any way affect the express provisions (including the warranties, covenants, agreements, conditions, representations or any of the obligations and indemnifications, and the limitations relating thereto, of Assignee or Assignor) set forth in the Purchase Agreement, this Assignment being intended solely to effect the transfer of certain assets, obligations and liabilities pursuant to the Purchase Agreement. To the extent any provision of this Assignment is inconsistent with the Purchase Agreement, the provisions of the Purchase Agreement shall govern and control.

[SIGNATURE PAGES FOLLOW]

3

IN WITNESS WHEREOF, Assignor and Assignee have caused this Assignment to be executed as of the day and year first above written.

**ASSIGNOR:**

**iCoreConnect Inc.**

By: _____
        Name: Archit Shah
        Title: Chief Financial Officer

**iCore Midco Inc.**

By: _____
        Name: Archit Shah
        Title: Treasurer

**<u>ASSIGNEE:</u>**

**Colortech Holdings, LLC**

By: ____
 Name: Sanjay C. Patel
Title:   Managing Member

**Exhibit A**

**INTELLECTUAL PROPERTY**

"Intellectual Property" means, interchangeably and collectively as the context requires: (i) patents and invention disclosures, including continuations, divisionals, continuations-in-part, renewals and reissues; (ii) trademarks, service marks, trade names, trade dress, designs, logos, emblems, signs or insignia, slogans, domain names and other similar designations of source or origin, together with all goodwill symbolized by the foregoing; (iii) copyrights and copyrightable material; (iv) trade secrets and other confidential information, know-how, customer lists, prospect lists, business plans, inventions, proprietary processes, formulae, algorithms, models and methodologies; (v) rights of publicity and privacy relating to the use of the names, likenesses, voices, signatures and biographical information of natural Persons; (vi) all rights with respect to hardware, software, computer programs, computer program code (including source code and executable code), the algorithms underlying any computer program, documentation associated with any software, data and databases, to the extent not otherwise embodied in the foregoing clauses (i)-(v); (vii) all moral rights and/or rights of attribution and/or integrity in any of the foregoing; (viii) registrations and applications for any of the foregoing; (ix) the right to sue for past infringement or unauthorized use of any of the foregoing; and (x) all other intellectual property, including the following:

[icore to complete]

1